**B. L. LAWRENCE, Plaintiff and Appellee,**

v.

**Estella G. LAWRENCE, Defendant and Appellant.**

**Civ. No. 8906.**

Supreme Court of North Dakota.

May 7, 1974.

Bair, Brown & Kautzman, Mandan, for appellant.

Bjella & Jestrab, Williston, for appellee.

RALPH B. MAXWELL, District Judge.

The prolonged record in this divorce case reaches back to September of 1961 when the plaintiff B. L. Lawrence initiated proceedings to terminate his marriage with the defendant. In her answer and counterclaim the defendant wife denied any misconduct and asserted her own cause of action for divorce against the plaintiff.

After the case was heard in early 1962, the court granted a divorce to the defendant wife. Among other things, the court found that the husband had physically beaten defendant; that he had openly kept company with other women; that he had given money and jewelry to other women; and that he had admitted to adulterous sex relations.

The court in its findings declared that it wanted each of the parties to have an equal portion of the family resources. The principal property was a trucking business known as Lawrence Brothers Transportation. The court stated:

". . . (T)hat the best interests of both parties will be served if the plain-

tiff is permitted to continue the business in operation but is required to assign certain property and pay a fixed sum to the defendant as a property settlement."

In addition to some real estate interests, the defendant wife was awarded $90,000. This sum was labeled "further property settlement, and not as alimony." It was to be paid at the rate of $500 per month, without interest.

For eight years the plaintiff routinely sent the monthly payments to the defendant. Then, early in 1970, he initiated negotiations for a substitute arrangement. He informed his former wife that Lawrence Transportation was losing money. It seems his business had consistently grown during an animated era of oil discovery and development in the area; but such activity had slackened. He found he had on his hands a faltering monstrosity that had ballooned beyond the needs of a withering oil field trade. He told his ex-wife that he faced bankruptcy. She was asked to agree that the assets of Lawrence Transportation be sold, the plaintiff's creditors paid off, and the net sale proceeds divided evenly between them. This arrangement was to be in lieu of some $41,000 still due her under the divorce decree.

During these negotiations plaintiff supplied accounting records purporting to reflect the financial position of the trucking business. These accounts represented that the net value of the assets was about $212,000.

Eventually the defendant acquiesced, and a written stipulation was entered into. It provided for modification of the divorce judgment by elimination of the provision for $90,000 in monthly payments and substituting the following language:

"That the plaintiff sell all of the assets used in the operation of Lawrence Brothers Transportation Company at public auction or private sale in a manner in which the plaintiff deems most profitable for the parties hereto, selling all of the trucks and equipment used and useful in the carrying on of the said Lawrence Brothers Transportation Company operation, including all authority granted by the North Dakota Public Service Commission and/or the Interstate Commerce Commission and to pay all of the indebtedness of said Lawrence Brothers Transportation Company out of the proceeds therefrom and to pay all of the costs incurred in the sale of said assets and to divide the balance equally between the parties hereto, furnishing to the defendant and to her counsel a true accounting of all the sales transactions, all the indebtedness paid therefrom and all costs incurred thereby."

An amended judgment, incorporating the verbatim language of the stipulation was thereafter approved by the court and filed.

Plaintiff then made arrangements to hold an auction sale, intending to dispose of most of his assets in that way. Unfortunately bad weather the day of the sale sharply reduced attendance. There was a lack of brisk competition and much of the equipment went at bargain figures. Plaintiff bid back several larger items rather than let them go at sacrifice prices.

Following the auction, plaintiff made some unsuccessful efforts to sell the remaining equipment along with his State and Federal authority to do business. Meanwhile, he continued in business with the equipment that had not been sold.

Eventually he discontinued further efforts to sell. He contended he was unable to induce any prospective purchaser to offer enough to even cover his debts.

Operation of the business on a diminished scale proved quite profitable. In 1971, for example, it netted over $40,000 on a gross income of approximately $260,000. The record does not include the results of his operations after 1971.

When defendant discovered that plaintiff was continuing with the business rather than selling as their stipulation required,

she promptly filed a motion to reinstate the original judgment. On September 30, 1970, the motion was heard; the court concluded it was brought prematurely. The court said the plaintiff "will still have to comply with the provisions of the judgment, unless the defendant desires him to recede from that. And this would mean that he should continue to make an effort to sell the equipment as provided in the agreement." The hearing was continued "pending the final liquidation of the company."

On October 19, 1972, the hearing was resumed. The plaintiff gave testimony indicating he was still in possession of, and operating Lawrence Transportation. However, he contended he had, in May 1971, turned the entire business over to his principal creditor, the American State Bank of Williston. He traced his present ownership to a subsequent deal he made with the bank in August of the same year.

According to the plaintiff he was instructed by an officer of the bank in May 1971 to terminate his business operations and deliver the keys. A day or so later, he did tender the keys to the banker. However, the banker had changed his mind. He told plaintiff he did not want the keys, but instead wanted plaintiff to cooperate in disposing of the business. Plaintiff testified that the banker said:

"You go ahead and operate one or two of the trucks, get you one man to help you, and then on the side you try to help me sell that stuff."

Plaintiff agreed. He did sell some of the business assets. The proceeds were applied on his debt to the bank.

Then in August, an unusual transaction took place. According to plaintiff, he purchased from the bank the remaining units of equipment for $57,000. He described the circumstances:

"Then he asked me to give him a bid on the units that was left, this Mr. Fred. And I told him—I said, 'I don't have the money to pay you with, and I don't know after all this bank troubles that any other bank would finance me.'

"They said, 'Well, we might finance it ourselves if you give us the bid—or get it financed.'

"So I bid fifty-seven thousand dollars on the balance of the stuff that he had left—the four trucks, two big tandems, two small tandems, and about three trailers and an old junked American Crane that it is salvage.

"So they came to me later and says we can make more moneys by letting you have it because if we sell these other trucks we are going to end up, as Fred said, 'we will probably get the authority taken away from us for letting it set,' you know, and so they drew up a five-year plan at eleven hundred and, I think, sixty-nine dollars a month. And I accepted it. And I have been operating under that setup so far."

The trial court found this transaction did actually constitute a sale of the remaining assets of the trucking business, and that it competently discharged plaintiff's obligations under his stipulation with defendant. The court said:

"(T)he plaintiff . . . completed on August 26, 1971, a sale of the assets of Lawrence Transportation by (sic) the American State Bank upon the best terms obtainable, the proceeds of such sale. Moreover, a most cautious review edness of Lawrence Transportation and the costs of the sale."

■ Unless clearly erroneous, the findings of the trial court are not to be disturbed on appeal. Rule 52(a) N.D.R.Civ. P. Dobler v. Malloy, 214 N.W.2d 510, 514 (N.D.1973). However, in this case we are unable to find support even in the plaintiff's own version of the bank transaction for the trial court's ruling that there was a sale. Moreoever, a most cautious review of the entire record discloses no palpable basis to sanction such deduction.

The bank obviously could not sell that which it did not own. The record falls far short of showing that the bank ever owned Lawrence Transportation or any part of the assets. Quite the contrary. There was never a delivery to the bank, either physical or by written instrument. Even the symbolic delivery of the keys was never consummated. State and Federal certificates of authority to do business were never transferred to the bank. Neither were the documents of title to the vehicles. Plaintiff retained as his own all the income that the business generated. On his income tax returns he reported all the income as his own. He continued to depreciate the assets as before.

These factors plainly negate a transfer of ownership from plaintiff to the bank. Hence the bank had nothing to re-convey to plaintiff in August 1971.

Furthermore, the bank did not receive the $57,000 that plaintiff claims to have "bid" on the assets in August 1971. In fact, the record shows the exact opposite. Plaintiff received $57,000 at that time from the bank so that he could satisfy some of his other creditors and continue in business. The promissory note in that amount which he signed was labeled "renewal." What this amounted to was simply a refinancing transaction. We therefore hold the trial court's conclusion that there was a sale to be clearly in error.

The ultimate question still remains, however: Should the stipulation be set aside? Plaintiff takes the view that, all considerations of the bank transaction aside, defendant has still shown no cause for relief from the stipulation.

Stipulations made by parties to a lawsuit may always be nullified by the court for good cause. Lilly v. Haynes Co-op Coal Mining Co., 48 N.D. 937, 188 N.W. 38, 40 (1922)

"That trial courts may, in the exercise of a sound judicial discretion for good cause shown and in furtherance of jus-

tice, relieve parties from stipulations which they have entered into in the course of judicial proceedings is elementary." Northern Pac. Ry. Co. v. Barlow, 20 N.D. 197, 126 N.W. 233, 238 (1910)

Generally, stipulations are either procedural or contractual in nature. Procedural stipulations are aimed at facilitating the course of a lawsuit. They simplify proof or foreshorten procedural requirements. Contractual stipulations affect the subject matter of a lawsuit. They deal with the rights or property at issue. They are styled stipulations only because they occur in connection with litigation. In essence they are contracts and are entitled to all the sanctity of a conventional contract. Thayer v. Federal Life Ins. Co., 217 Wis. 282, 258 N.W. 849, 850 (1935). The essential distinction between contractual stipulations and contracts lies in remedy. The court retains management and control over all stipulations. Remedies can be sought and relief afforded in that same action rather than starting afresh with another lawsuit. Goldstein v. Goldsmith, 243 App. Div. 268, 276 N.Y.S. 861 (N.Y.1935)

The stipulation which the defendant would invalidate in the instant case is contractual. In determining whether a contractual stipulation is to be set aside, the law of contracts should be consulted. By her motion, plaintiff is seeking a result comparable to rescission in a contract case. Therefore we shall look to the law governing rescission of contracts for guidance.

Our statute gives a party to an agreement the right to rescind for failure of consideration. Sec. 9-09-02 NDCC. Consideration for a contract fails when a party has failed or refused to perform a substantial part of his bargain. See Skinner v. Scholes, 59 N.D. 181, 229 N.W. 114, 116 (1930); Schaff v. Kennelly, 61 N.W. 2d 538, 544 (N.D.1953).

Defendant points out that in the stipulation, plaintiff obligated himself to sell all the assets of Lawrence Transportation, in-

cluding *all* of the trucks and equipment and *all* public carrier authority granted by the State and Federal governments. She charges that after plaintiff sold but a portion of the assets, he abandoned the stipulation and continued to operate the business for his own benefit.

■ The record fully supports the defendant's contentions. Plaintiff has plainly breached the agreement by failing to perform according to its terms. Such breach is far from insubstantial in degree. Therefore, under the law, she would be entitled to rescind.

Against this result, the skill and eloquence of plaintiff's counsel have argued fulgently. He has urged that plaintiff made sincere efforts to sell everything; that he halted these efforts only when it became apparent there would be no surplus to divide. Counsel stresses that defendant is in no poorer position than if plaintiff had taken the best offer he could find.

It is true that a sale of the remaining assets at a loss would have left both parties empty-handed. Thus defendant is ostensibly no worse off than if the plaintiff had complied with the stipulation. But if we look at the equities here, as counsel's argument challenges us to do, we must take account of the benefits accruing to plaintiff. He has been freed of a $41,000 indebtedness to his former wife. He has retained Lawrence Transportation. He has been enabled to bring the business into manageable and profitable dimensions by paring off an excess that threatened ruin. He has lived on the comfortable income it has produced. He has had the satisfaction of reducing his debts. We must ask: How much should he be entitled to prosper through his breach of contract? Should this woman, who is faultless here, bear all the detriment while he enjoys the several benefits stemming from his breach? Would it not be unconscionable to indulge such a gross disparity in the fortunes of parties, the one innocent, the other at fault?

We recognize that plaintiff's motives for abandoning his commitment to sell were certainly not devoid of nobility. He wanted to pay his debts. He said:

> "I intend to keep on operating Lawrence Transportation or sell Lawrence Transportation until I can pay the contractors that did not sign this agreement, because they have confidence in me that I will try to pay them. They didn't sign any sale agreement with me."

He chose his obligation to his creditors over his obligation under the stipulation. However, in so doing, he conferred upon defendant the right to rescind. She has exercised that right.

We hold that the compelling force of both the law and the equities in the case requires us to direct a restoration of the parties' rights as they existed prior to the stipulation.

The order denying the motion to reinstate the original judgment is reversed, and the case is remanded to the trial court for disposition consistent with this opinion.

VOGEL, J., disqualified.

ERICKSTAD, C. J., and PAULSON, TEIGEN and KNUDSON, JJ., concur.