**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Joseph·Wayne YODSNUKIS, Defendant and Appellant.**

**Cr. No. 659.**

Supreme Court of North Dakota.

June 28, 1979.

---

Thomas H. Falck, Jr., Asst. State's Atty., Grand Forks County, and Patricia R. Ellingson, Senior Law Intern, University of North Dakota Law School, Grand Forks, for State of North Dakota; argued by Ms. Ellingson.

Dwight F. Kalash, of Nelson & Kalash, Grand Forks, for defendant and appellant.

VANDE WALLE, Justice.

Joseph Wayne Yodsnukis was tried by a jury and convicted of robbery. He appeals to this court from the conviction and from the district court's denial of his motion for new trial. We reverse the district court's denial of his motion and remand to the district court for a new trial.

On September 22, 1977, at approximately 8 p. m., a man robbed Fat Albert's restaurant in Grand Forks, North Dakota, of $115. The culprit handed an employee a note stating that he had a gun, that he wanted money, and that an accomplice was waiting in a car outside the restaurant with a rifle. The employee who received the note and another employee, both young women, observed the man and noted that he wore a green fatigue jacket, blue jeans, boots, and a red and white stocking cap. One of the employees gave $115 to the man, and he quickly fled. Shortly thereafter, one of the employees called the Grand Forks police to inform them of the robbery. The police investigated, and the next day found a red and white stocking cap on the ground near the restaurant. With the aid of informa-

tion supplied by the two employees, a police officer made two composite drawings of the robber.

Ten days after the robbery occurred, Joseph Wayne Yodsnukis entered Fat Albert's restaurant to purchase sandwiches. Upon seeing him, Rosann Borscheid, one of the two employees who observed the robbery, recognized him as the man who robbed the restaurant on September 22. When Yodsnukis left Fat Albert's, she watched him return to his automobile, obtained his motor vehicle license number, and immediately imparted both her identification and his license number to the police. Determining that the license had been issued to Yodsnukis, the Grand Forks police requested a deputy sheriff at Gilby, North Dakota, to inform Yodsnukis, who was living on a farm near Gilby, that they wanted to meet with him. After the deputy sheriff did this, Yodsnukis contacted the Grand Forks police and arranged a meeting with them the following day. In that meeting Yodsnukis denied involvement in the robbery. From the record it appears that he might have told the police that on the evening of the robbery he either attended a horse show at the University of North Dakota, stayed at home on the farm, or went in to Gilby. The police later discovered that the horse show did not take place on September 22, 1977. At a showup conducted by the police, the other employee working at Fat Albert's on the evening of the robbery, Esperanza Holweger, also identified Yodsnukis as the robber.[1]

Following an investigation, the State's Attorney's office in Grand Forks County, North Dakota, filed an information against Yodsnukis charging him with robbery. Yodsnukis pleaded not guilty to the charge and requested a trial by jury.

In the trial conducted in the district court, the State presented the testimony of the employees, who identified Yodsnukis as the robber, the owner of the restaurant, who calculated the amount of money taken during the robbery, and various police officers, who told of their investigation of the robbery.

Yodsnukis testified in his own behalf. He then presented testimony from his wife, father-in-law, mother-in-law, and sister-in-law, all of whom said they saw Yodsnukis at home at or near the time the robbery occurred. Yodsnukis also presented testimony from a former Fat Albert's employee who said that Yodsnukis had been in the restaurant several times prior to the robbery and from co-workers who vouched for Yodsnukis's good character.

At the conclusion of the trial, the jury found Yodsnukis guilty of robbery. Shortly after the jury announced its verdict, the State and Yodsnukis entered into the following stipulation:

"IT IS HEREBY STIPULATED AND AGREED by and between the State of North Dakota, represented by the Grand Forks County State's Attorney's Office and Defendant, Joseph Wayne Yodsnukis, represented by Dwight Kalash of Nelson and Kalash, Grand Forks, North Dakota, that Defendant, Joseph Wayne Yodsnukis, will submit to a polygraph examination conducted by Leo J. Brown of Brown Audit Co., Sioux Falls, South Dakota. Such examination will be conducted on the 4th day of May, 1978, at 1:00 o'clock p. m.

"It is agreed that any and all results of said polygraph examination will be admissible in any subsequent trials or hearings associated with the matter presently pending in the District Court, First Judicial District of North Dakota.

"It is further agreed that the testimony of the administrator of the examination, Leo J. Brown of Brown Audit Co., Sioux

---

1. "Although the term 'showup' is sometimes used interchangeably with the word 'lineup' to mean an array of persons, including a suspect or suspects, presented to a witness or group of witnesses, it appears that 'showup' more commonly and more properly refers to a situation where, as in the instant case, one suspect is shown by himself to a witness or a group of witnesses." [Citation omitted.] *State v. Johnson*, 538 S.W.2d 73, 75, fn. 2 (Mo.App.1976). Here, through a one-way (transparent) mirror, Yodsnukis—alone— was viewed by Ms. Holweger.

Falls, South Dakota, will be admissible in any subsequent trials or hearings.

"It is further agreed that the Defendant, Joseph Wayne Yodsnukis, has read the above, understands the contents thereof and hereby voluntarily waives his right to remain silent and to have counsel present at said polygraph examination."

Mr. Brown conducted the polygraph examination and, in his analysis of its results, stated that Yodsnukis indicated "no deception" when he denied that he committed the robbery. Yodsnukis then submitted to the district court a motion for new trial under Rule 33, North Dakota Rules of Criminal Procedure,[2] and *State v. Olmstead*, 261 N.W.2d 880 (N.D.1978), cert. denied 436 U.S. 918, 98 S.Ct. 2264–2265, 56 L.Ed.2d 759 (1978),[3] premised upon the polygraph results,[4] which, he contended, constituted "newly discovered evidence." The district judge denied this motion, concluding that the polygraph results obtained subsequent to the jury's verdict did not "constitute newly discovered evidence that is so material and relevant to the issue of the Defend-

ant's [guilt or innocence] that a new trial is required in the interest of justice."

Yodsnukis presents two issues on appeal to this court:

1. Did the district court err in denying the motion for new trial made by Yodsnukis?

2. Did the district judge's interrogation of witnesses in the presence of the jury constitute an abuse of discretion?

■ We conclude that the district court erred in denying Yodsnukis's motion for a new trial. A new trial was warranted in the interest of justice, first, because we cannot determine whether the district court considered the results of the polygraph examination when passing on the merits of the motion for new trial, and, second, because the district judge's interrogation of witnesses, for the most part laudable, overstepped the bounds of propriety in one instance.

■ Yodsnukis made his motion for new trial under Rule 33, N.D.R.Crim.P., based solely upon the results of the polygraph examination.[5] He argues on appeal that

2. Rule 33, N.D.R.Crim.P., at the time this case was tried, provided:

"The court on motion of a defendant may grant a new trial to him if required in the interest of justice. The motion for a new trial shall be in writing and shall point out with particularity the defects and errors complained of. A motion based upon newly discovered evidence or jury misconduct shall be supported by affidavits. When affidavits are presented to the court in support of a motion for new trial, the court, when the affiants are residents of this State, may compel their personal attendance before it, and they may be examined and cross-examined under oath, touching the matters set forth in their affidavits. A motion for a new trial based on the ground of newly discovered evidence must be made within 30 days after discovery of the facts upon which it is made and within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial on any other grounds shall be made within 7 days after verdict or finding of guilt or within such further time as the court may fix during the 7-day period. Nothing in this Rule shall be construed to affect the remedies provided by Chapter 29–32, N.D.C.C."

Amendments to this rule which became effective January 1, 1979, are not applicable.

3. This court's decision in *Olmstead* was appealed to the United States Supreme Court on grounds not herein relevant.

4. Neither the stipulation between Yodsnukis and the State nor Yodsnukis's motion for new trial mentioned an earlier polygraph examination administered to Yodsnukis in conjunction with this case.

5. Rule 33, N.D.R.Crim.P., superseded Chapter 29–24, N.D.C.C. Section 29–24–02, N.D.C.C., which specifically enumerated the situations in which a court could grant a new trial when a verdict had been rendered against a defendant, provided, in part, that a court could grant a new trial:

"7. When new evidence is discovered which is material to the defense and which the defendant could not, with reasonable diligence, have discovered and produced at the trial;
. . ."

This court has acknowledged the "reasonable diligence" requirement in criminal cases many times. See, e.g., *State v. Jager*, 91 N.W.2d 337 (N.D.1958); *State v. Thompson*, 68 N.D. 98, 277 N.W. 1 (1938); *State v. Zimmerman*, 60 N.D. 256, 233 N.W. 845, 79 A.L.R. 816 (1930); *State v. Carter*, 50 N.D. 270, 195 N.W. 567 (1923).

the district court erred in denying his motion. As we said in *State v. DePriest*, 206 N.W.2d 859, 862 (N.D.1973), and iterated in *State v. Holy Bull*, 238 N.W.2d 52, 55 (N.D. 1975), and, most recently, in *State v. Olmstead, supra*, 261 N.W.2d at 887:

> "A motion for new trial is also addressed to the trial court's judicial discretion and its decision will not be set aside unless an abuse of discretion is shown."

*Polygraph Results*

Relying in large part on *State v. Olmstead, supra*, Yodsnukis argues that the district court abused its discretion in denying his motion for new trial. There, Olmstead and the State stipulated that, "for the purpose of the motion for new trial, Olmstead would submit to a polygraph test and the results would be admissible, . . ." in subsequent proceedings. 261 N.W.2d at 886. On appeal, Olmstead argued that consideration of the polygraph results was improper in light of his claim of the attorney-client privilege. Dismissing that argument, the court stated:

> "Olmstead, himself, never indicated that his counsel was not following his instructions in entering that stipulation and, while testifying at the hearing on his motion for new trial, confirmed that 'the whole basis of me getting a new trial was a lie detector test.' Additionally, Olmstead, himself, introduced the results of a previous, separate polygraph examination (which also indicated deception when he denied committing the rape). We assume that the stipulation is not disputed and

should be enforced by the court when no good cause is shown to the contrary. The fact that the results were unfavorable rather than favorable is not a good cause.

> 'The stipulation is in the nature of a contract and a party may not be relieved therefrom without first making application to the court and upon a showing of good cause.' *Bjerken v. Ames Sand and Gravel Company*, 206 N.W.2d 884, 888 (N.D.1973).

See, also, *Lawrence v. Lawrence*, 217 N.W.2d 792 (N.D.1974).

> "Whether relief from a stipulation will be granted rests in the sound discretion of the trial court. *Northern Pac. Ry. Co. v. Barlow*, 20 N.D. 197, 126 N.W. 233 (1910). No abuse of discretion is indicated here. Rule 502, NDREv, does not prohibit waiver of the lawyer-client privilege. His own statement at the motion hearing denies merit to Olmstead's argument that there was 'no knowing waiver.' We also agree with the majority in *People v. Barbara*, 400 Mich. 352, 255 N.W.2d 171 (1977), when they said that the question of whether polygraph may be used to assist a judge in determining whether to grant a motion for new trial is a different matter than the question of admissibility at a trial to show guilt or innocence." 261 N.W.2d at 886.

▮ By implication, the court in *Olmstead* held that the results of a polygraph examination, the admissibility of which both the prosecution and the defense have stipulated to, must be considered by the

---

Rule 33, N.D.R.Crim.P., contains no similar list of grounds for new trial; it provides, instead, that the court may grant a new trial "if required in the interest of justice" and specifically mentions only one ground—newly discovered evidence. Omitted from Rule 33 was the phrase that, to constitute new evidence, the evidence must be that "which the defendant could not, with reasonable diligence, have discovered and produced at the trial; . . ." The omission of that phrase does not signify, however, that reasonable diligence is no longer a relevant consideration in proceedings on motions for new trial based on newly discovered evidence. Rather, under the rule, a showing of reasonable diligence in the attempt to discover

the evidence prior to trial has become an important—and a sometimes but not always dispositive—factor for the court to consider when determining whether a new trial is required in the interest of justice. See Rule 33, N.D.R. Crim.P., Explanatory Note; Travis and Jacobson, "An Introduction to the North Dakota Rules of Criminal Procedure," 50 N.D.L.Rev. 1, 18 (1973). This factor has obvious applicability to a defendant's argument that exculpatory polygraph results obtained after the jury has returned its verdict or the court has rendered its decision warrant a new trial. See, e.g., *McCroskey v. United States*, 339 F.2d 895 (8th Cir. 1965).

court as it determines the merits of a motion for new trial.[6]

We cannot determine whether the trial court denied Yodsnukis's motion for new trial because it held that the polygraph results, as a matter of law, could never constitute newly discovered evidence under Rule 33, N.D.R.Crim.P., or because it held, after considering those results, that a new trial was not required in the interest of justice. Only the latter holding would be consistent with *Olmstead*. The trial court's order denying the motion for new trial indicates that the court followed the latter course, but the trial court's initial, oral announcement of its decision to deny the motion indicates that it followed the former course.

### Trial Judge's Interrogation

Rule 614(b), North Dakota Rules of Evidence, provides:

"Interrogation by court. The court may interrogate witnesses, whether called by itself or by a party."

The Procedure Committee Notes to this rule state that it is an adoption of Rule 614 of the Federal Rules of Evidence. The Advisory Committee's Note to Rule 614(b), F.R. Evid., states:

"The authority of the judge to question witnesses is also well established. McCormick § 8, pp. 12–13; Maguire, Weinstein, et al., Cases on Evidence 737–

739 (5th Ed. 1965); 3 Wigmore § 784. The authority is, of course, abused when the judge abandons his proper role and assumes that of an advocate, but the manner in which interrogation should be conducted and the proper extent of its exercise are not susceptible of formulation in a rule. The omission in no sense precludes courts of review from continuing to reverse for abuse." [7]

The Advisory Committee's Note to Rule 614(b), F.R.Evid., is consistent with our perception of the trial judge's role under Rule 614(b), N.D.R.Ev., and our scope of review on appeal. See *State v. Olson*, 244 N.W.2d 718 (N.D.1976).

■ To determine, however, whether the judge's interrogation of witnesses was proper or, conversely, unduly prejudicial to the defendant and therefore an abuse of the judge's discretion, is a formidable task.[8] We must, on the one hand, vigilantly protect the defendant's right to a fair trial [U.S.Const. Amend. VI; N.D.Const. Art. I, § 13], but, on the other hand, we must allow—and even encourage—the trial judge to clarify testimony and ferret out elusive facts so long as he does so impartially. As we said in *State v. Olson, supra*, 244 N.W.2d at 722, we are aided in evaluating the trial judge's interrogation of a witness by a summary of cases contained in 3 Weinstein & Berger, *Evidence* ¶ 614[03], at 614–13 and 614–14:

---

**6.** The court in *Olmstead*, however, did not hold that exculpatory results of a polygraph examination require a new trial. It held only that those results must be considered by the district court when it determines whether the interest of justice requires a new trial. In taking this position, we do not mean to suggest that every stipulation is binding without approval of the court.

**7.** Prior to the adoption of the North Dakota Rules of Evidence, North Dakota trial judges also held authority to interrogate witnesses in both civil and criminal cases. See, e. g., *State v. Olson, supra; Miller v. Miller*, 79 N.D. 161, 55 N.W.2d 218 (1952); *Pearce v. Hanlon*, 60 N.D. 231, 233 N.W. 840 (1930); *Messer v. Bruening*, 32 N.D. 515, 156 N.W. 241 (1916); *State v. Hazlett*, 14 N.D. 490, 105 N.W. 617 (1905). In *State v. Hazlett, supra*, 14 N.D. at

497, 105 N.W. at 619, the court defined the purview of this authority:

"The right, and even the duty, of the trial court to ask questions of the witness, for the purpose of eliciting fully and clearly all the facts within the witness' knowledge, cannot be questioned; but the right should be exercised with great caution, so as to avoid, if possible, anything from which the jury might infer that the trial judge had any opinion or leaning in favor of one side or the other. As every practitioner knows, the jury are usually quick to seize upon and be guided by any opinion which they think the trial judge entertains as to the merits of the case or the weight of any particular evidence."

**8.** In the words of one court, "The law in this area is as easy to state as it is difficult to apply." *United States v. Hickman*, 592 F.2d 931, 932 (6th Cir. 1979).

"Factors that an appellate court may consider in evaluating the impact of the judge's questioning are whether the witnesses' testimony needed clarification, whether the witnesses were unusually hesitant and in need of assurance, whether the court used leading questions, whether the court interfered with cross-examination, whether the court's interruptions favored one side exclusively, whether the court instructed the jury to arrive at their own conclusions, whether the parties were being adequately represented, and whether an objection to the questioning was made." [Footnotes omitted.]

The trial judge in this case actively participated in the examination of most witnesses. Yodsnukis has pointed out many examples of the judge's interrogation that, he asserts, were prejudicial to him and therefore an abuse of discretion. Most of the judge's questions were, in our opinion, designed solely to clarify the examined witnesses' testimony. By posing these questions, the judge acted properly and, we believe, should be commended for his attempt to make the facts comprehensible to the jury.

We are troubled, however, by the trial judge's examination of a policeman, Officer Ralph Downey, who had investigated the robbery. Following direct examination by the State's Attorney and cross-examination by the attorney for Yodsnukis, the trial judge questioned Officer Downey:

"Q. Did you check what the weather conditions had been September 22nd or 21st or 23rd during that time?

"A. The night of the 22nd it had been raining. The afternoon of the 23rd when I was out in the area there it was still dreary and dampt [sic] and kind of misting a little bit.

"Q. Do you know what the mean temperature or the average temperature for Grand Forks vicinity would be for approximately to September 22nd?

"A. September can be a fairly warm month but I know that this particular day I was wearing a topcoat so it was a little cool.

"Q. The point of my question is: Would it be common for people to be wearing stocking caps?

"A. No I wouldn't think so except for the fact that it was raining.

"Q. September, I suppose, your average day in September would probably run 60 degrees or better?

"A. Possibly.

"Q. If it wouldn't be raining?

"A. Yes.

"Q. Well about how long have you lived in Grand Forks?

"A. In Grand Forks itself for 25 years.

"Q. I was just thinking in terms of common experiences of what people do. Do you think it would be common for people to wear stocking caps?

"A. I would think no that a stocking cap would not be worn that time of the year normally.

"Q. Particularly by young people, would they be running around with a stocking cap on?

"A. I wouldn't think so.

"Q. Well, in your work as a detective, would that indicate anything to you?

"A. Well—

"Q. I'm speaking or inquiring in terms of the robber wearing the stocking cap?

"A. Maybe someone wouldn't think about it but I would have a tendency to wonder about someone wearing a stocking cap in that type of a situation, but again the average man on the street probably wouldn't think anything of it.

"Q. To me wouldn't it indicate an attempt to disguise your hair for instance?

"A. I would think so. In my line of work and in my experience would be towards that and I have a tendency to suspect that but maybe these gentlemen here or people in the jury might not think anything of that.

"Q. What about the Defendant's hair when you observed him, how did it appear to you?

"A. Well his hair then was considerably longer than it is now and it could be many times situations like that has been used to tuck the hair up to make it look shorter where a robbery is concerned or anything of that nature.

"Q. You say it was considerably longer, how would you describe it?

"A. Well, it was down over his ears and it was much more rough shot [*sic*] than it is now. It was kind of straggly.

"Q. Could it have been covered by this stocking cap?

"A. Oh yes."

In conformance with Rule 614(c), N.D.R. Ev., the attorney for Yodsnukis objected to the judge's interrogation at the first available opportunity out of the presence of the jury.

On the issue of the stocking cap, Officer Downey's testimony needed no clarification, and Officer Downey himself did not appear hesitant or in need of assurance. Although the judge interrogated witnesses for both sides, in large part favoring neither side, the leading questions posed to Officer Downey might well have led jurors to believe that the judge thought the robber wore a stocking cap to conceal his long hair. A jury might have properly drawn this inference from the testimony of various witnesses, but that inference should have been developed by the State, not the trial judge.[9] In his questioning of Officer Downey, the judge removed the robe of impartiality that he wore at all other times throughout the trial and, in so doing, acted in a manner prejudicial to Yodsnukis. The prejudicial effect of the judge's interrogation is heightened when we remember that, as this court trenchantly observed in *State v. Hazlett*, 14 N.D. 490, 105 N.W. 617 (1905), jurors are quick to be influenced by any opinion that they think the trial judge harbors about the merits of the case or the weight of certain evidence.

Because of the unclear record as to the ground for the trial court's denial of the motion for new trial, and because of the isolated, yet prejudicial, instance of the trial judge's improper interrogation of a witness, we conclude that the interest of justice required that Yodsnukis receive a new trial and that the trial court therefore abused its discretion in denying the motion for new trial. Accordingly, we reverse the district court's denial of the motion for a new trial, and remand for a trial on the merits. Were we faced on this appeal with either the issue of the polygraph results alone or the issue of the judge's interrogation alone, we might be inclined to reach a different result.

Reversed and remanded.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.

---

**9.** The State had already developed this inference through the testimony of Rosann Borscheid, one of the employees working at Fat Albert's when the robbery occurred.