283 N.W.2d 83 (1979)
In the Interest of J. A., D. D., E. D. (Jr.), and T. D., Minors.
Clarence O. OHLSEN, Director of the Grand Forks County Social Service Center, Petitioner and Appellee,
v.
E. D. (father) and V. D. (mother), Respondents and Appellants.
Civ. No. 9491.
Supreme Court of North Dakota.
July 13, 1979.
*84 F. John Marshall, of Letnes, Marshall & Hunter, Grand Forks, for petitioner and appellee.
Richard A. Ohlsen, of Mack, Moosbrugger, Ohlsen & Dvorak, Grand Forks, for respondents and appellants.
Dwight F. Kalash, Grand Forks, guardian ad litem of the minor children, and Scott T. Johnston, senior law student, University of North Dakota, for minors; argued by Johnston.
VANDE WALLE, Justice.
The parents of J. A., D. D., E. D. (Jr.), and T. A. appeal from a juvenile court order terminating their parental rights. We affirm.
D. D., E. D. (Jr.), and T. D. are the natural children of both parents. J. A. is the natural child of V. D. by a previous marriage. At the time of the termination proceedings in 1978, J. A. was seven years old; E. D. (Jr.) and D. E., twins, were four years old; and T. D. was three years old. In October 1976 a petition alleging deprivation of the children was filed by Thomas L. Zimney, Assistant State's Attorney, Grand Forks County, after a complaint of abuse had been made to the Grand Forks County Social Service Center. The children were then placed under the temporary care, custody, and control of the Director of the Grand Forks County Social Service Center *85 until a hearing was held on the petition. In November 1976 the petition was heard before a referee of the juvenile court and, in a proposed order, the children were found to be deprived children. That order was approved by the juvenile court and the care and custody of the children was continued in the Director of the Grand Forks County Social Service Center for a period not to exceed 60 days.
Subsequent hearings before the juvenile referee, resulting in orders approved by the juvenile court, were conducted over a period of several months. On November 23, 1977, a petition for termination of parental rights was filed by Clarence O. Ohlsen, Director of the Grand Forks County Social Service Center. That petition was heard before the juvenile court on January 17, 18, and 19, February 8, 22, and 23, and March 1, 1978. The juvenile court issued its order terminating parental rights on April 24, 1978, after hearing some 25 witnesses whose testimony covered approximately 800 pages. The juvenile court found the children to be deprived because of physical abuse by the parents, neglect of the children by the parents, total lack of love and respect for the well-being of the children by the parents, the unhealthy condition of the children caused by the parents, and the condition of the home. The juvenile court further found that the causes and conditions of the deprivation were likely to continue or would not be remedied in the future and that by reason thereof the children were suffering or would probably suffer serious physical, mental, moral, or emotional harm.
The parents present four issues on appeal:
"1. Did the trial judge abuse his discretion by interrogating certain witnesses as to the likelihood that the causes and conditions of deprivation would continue?
"2. Was counsel for respondent required to object to the Judge's questioning of the witnesses in order to raise the issue on appeal?
"3. Were respondents required to submit to a physical and mental examination under Rule 35 of the North Dakota Rules of Civil Procedure?
"4. Did Petitioner present clear and convincing evidence that the causes and conditions of deprivation are likely to continue or will not be remedied?"

I
With respect to the first issue, the parents argue that the trial judge abused his discretion by interrogating certain witnesses as to whether or not the causes and conditions of deprivation of the children would continue. The parents concede that a limited amount of interrogation by the trial court is permissible, but argue that, by its questions, the trial court assisted the petitioner in proving one of the necessary elements required in Section 27-20-44(1)(b), N.D.C.C., for termination of parental rights: that the causes and conditions of the deprivation are likely to continue or will not be remedied.
The parents urge that in a case involving the termination of parental rights, we should adopt the rule applicable in criminal proceedings, i. e., that the judge's discretion in questioning witnesses should be more limited than it is in a civil proceeding. See 98 C.J.S. Witnesses, § 348; State v. Yodsnukis, 281 N.W.2d 255 (N.D.1979). In support of their position the parents point out that the termination of parental rights is akin to a criminal proceeding because the termination of parental rights may have more serious consequences than many criminal proceedings and that the standard of proof is higher in termination proceedings as compared to other civil proceedings.
Ohlsen, however, refers us to Section 27-20-24(1), N.D.C.C., which provides, in part, that hearings conducted under the Uniform Juvenile Court Act are to "be conducted by the court without a jury in an informal but orderly manner, . . ." Ohlsen also points out that in at least two previous decisions this court has indicated that proceedings in juvenile court in this State are civil in nature and not criminal. See In re R. Y., 189 N.W.2d 644 (N.D.1971); In re Whiteshield, 124 N.W.2d 694 (N.D.1963).
*86 We agree with the parents that the termination of parental rights has serious consequences, but we decline to adopt the rule that the discretion of the juvenile judge in questioning witnesses should be governed by the rule in criminal proceedings, rather than in civil proceedings wherein his discretion is less restricted. There are substantial differences between criminal proceedings and proceedings under the Uniform Juvenile Court Act. Juvenile proceedings do not involve a jury, whereas in many criminal cases the jury, and not the judge, is the trier of fact; criminal proceedings have more of an adversary aspect than do juvenile court proceedings; under the Uniform Juvenile Court Act the judge has a different obligation than in criminal proceedings; and, perhaps most important, proceedings for the termination of parental rights are not instituted for the punishment of the parents, as criminal proceedings are brought for the punishment of the defendant; but, rather, termination proceedings directly concern the welfare of the child. Thus Section 27-20-01, N.D.C.C., provides that the Uniform Juvenile Court Act is to be construed to effectuate, among other purposes, "the care, protection, and wholesome moral, mental, and physical development of children coming within its provisions; " and to separate a child from his parents "only when necessary for his welfare or in the interest of public safety;. . ."
In urging us to adopt the rule applicable in criminal proceedings relative to the questioning of witnesses, the parents have impliedly recognized that in civil proceedings the judge has broader discretion to question witnesses and that under the rule applicable to civil proceedings the questioning of witnesses by the judge in this particular instance did not constitute an abuse of that discretion. In Messer v. Bruening, 32 N.D. 515, 156 N.W. 241 (1916), this court, in Syllabus No. 5, stated:
"A judge presiding on a trial is not a mere moderator, but has active duties to perform without partiality in seeing that the truth is developed, and it is his duty in the exercise of sound discretion to elicit the evidence upon relevant and material points involved in the case."
This position was repeated in Miller v. Miller, 79 N.D. 161, 55 N.W.2d 218 (1952), and is now embodied in Rule 614(b), N.D.R.Ev.
The parents note, however, that in In the Interest of R. L. D., 253 N.W.2d 870 (N.D. 1977), this court held that the burden is on the State, as the party challenging the right of the natural parents to the care, custody, and control of their child, to prove by clear and convincing evidence the existence of the factors necessary to terminate parental rights. They allege that by the questioning of certain witnesses the trial court assisted the State in satisfying this burden. The objections of the parents primarily involve questions by the trial court to witnesses concerning the probability of continued deprivation of the children  one of the elements the State has the burden of proving.[1]
*87 We have examined the entire transcript of the testimony before the juvenile court and we cannot conclude that the trial judge abused his discretion in the examination of the witnesses. In almost all instances the questions by the trial judge were posed to clarify the witnesses' previous testimony. In certain instances, the witnesses' answers to the questions of the judge resulted in additional questions asked by the *88 judge for further clarification. Because the witnesses had testified to a pattern of behavior, it was not improper for the judge to seek to determine whether that pattern would continue even if his interrogation tended to prove the existence of one of the elements necessary for termination of parental rights. The trial judge has an obligation to make a determination whether the deprivation is likely to continue, and if he does not understand the previous testimony of the witnesses on that issue, he has a duty to clarify their testimony. The fact that the judge outlined the elements necessary for termination of parental rights in asking that question is not an abuse of discretion since the witnesses were informed that their answers would be considered in that context. The witnesses were asked if they had an opinion and only when they stated that they did have an opinion were they asked for their opinion. We find nothing in the record to indicate that the trial court prompted the specific answers given by the witnesses.

II
In view of our conclusion with regard to the preceding issue, it does not appear necessary to consider whether counsel for the parents was required to object to the judge's questioning of the witnesses in order to raise the issue on appeal. The record, of course, reflects no such objection. Rule 614(c), N.D.R.Ev., provides that objections to the interrogation of witnesses by the court may be made at the time or at the next available opportunity when the jury is not present. Because a jury is not used in termination proceedings, there appears to be no good reason for counsel for the parents to fail to object at the time of the questioning by the trial judge if counsel felt an objection was warranted. Failure to object at trial may give the impression that objection on appeal is an afterthought on the part of counsel. More important, however, failure to object to the questioning at the time of trial does not permit the trial judge to consider the objections of counsel and to adjust his future questions if such objections have merit. We agree with the statement in Weinstein & Berger, Evidence, ¶ 614[04], at 614-15, quoted from the Project of a Committee of New York Trial Lawyers, Recommendation & Study Relating to the Advisory Committee's Preliminary Draft of the Proposed Federal Rules of Evidence 196 (1970):
"It seems both unrealistic and impractical to preserve this automatic objection until the conclusion of the trial. Judges are not so sensitive that counsel should be reluctant to make a proper objection merely because the question came from the bench. . . ."

III
Prior to the service of the petition to terminate parental rights, but after initial proceedings, including the filing of a petition to have the children declared deprived and taken into custody, Thomas L. Zimney, the Assistant State's Attorney of Grand Forks County, moved the court for an order requiring the parents to submit to a physical and mental examination. Judge Kirk Smith granted the motion after conducting a hearing. The petition to have the children declared deprived and taken into custody was predicated on a complaint of abuse. The motion to require the parents to submit to a physical and mental examination was made under Rule 35, N.D.R. Civ.P. The affidavit in support of the motion, executed by Zimney as petitioner, states that the examination was necessary "in order that a determination would be made as to [the parents'] ability to obtain physical custody of the above-named children or any one of them individually." The affidavit in support of the motion for examination also stated that Zimney understood that the parents "have been evaluated by some agency" other than the Child Evaluation and Treatment Program, University of North Dakota Medical Center, which he requested conduct the second examination.
Rule 35(a), N.D.R.Civ.P., provides:
"When the mental or physical condition (including the blood group) of a party, or a person in the custody or under the legal *89 control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician or to produce for examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made."
The parents argue that they did not place their physical and mental condition in controversy either by a claim or defense, and that it has not been shown that the "good cause" and "in controversy" requirements of Rule 35, N.D.R.Civ.P., have been met. They urge that the testimony of Dr. Lipp, the person who examined the parents under the order of the court granting the motion for examination, should be disregarded by this court in determining the next issue  whether Ohlsen presented clear and convincing evidence that the causes and conditions of deprivation are likely to continue or will not be remedied.
Ohlsen argues that the "good cause" and "in controversy" requirements of Rule 35 are met because he was required to show that the deprivation of the children was likely to continue in the future. In this regard he argues that the physical and mental examination would be useful and necessary because it was conducted in part for the purpose of determining the ability of the parents to provide adequate parental care for their children in the future. We do not find this argument persuasive.
Ohlsen also argues that because the parents had secured their own independent evaluation and were withholding the reports of such evaluation from him and the trial court, the matter was placed in controversy by the parents. Because we base our conclusion on another ground, we do not need to resolve this issue.
Ohlsen also points out that the objection to the introduction of the testimony of Dr. Lipp at the hearing on termination of parental rights was based on the physician- and psychotherapist-patient privilege under Rule 503, N.D.R.Ev., and that the privilege is not applicable to a court-ordered examination.[2] The record of the hearing on termination of parental rights reveals that counsel for the parents did object on the basis of the physician- and psychotherapist- patient privilege. The record also reveals, however, that at the time the motion to require the parents to submit to the examination was made, counsel for the parents filed an affidavit in opposition to the motion for physical and mental examination or evaluation on the basis that the parents had not put their mental or physical condition "in controversy." Judge Smith held a hearing on May 9, 1977, and ordered the parents to submit to the examination. The order of Judge Smith, dated May 10, 1977, indicates that Rule 35, N.D.R.Civ.P., was applicable; that it was in the best interests of the children that the examination be made; and that the parents had exercised their right to claim a privilege relative to their own independent evaluation and chose not to make the result of that evaluation available to the court.
At the hearing on termination of parental rights before Judge Bakken, the testimony of Dr. Lipp was objected to under Rule 503, N.D.R.Ev., and this court's decision in Interest of R. D. S., 259 N.W.2d 636 (N.D. 1977). The record does not reveal that that objection was made under Rule 35, N.D.R. Civ.P. It is clear to us that at the time of the termination hearing before Judge Bakken, the examination ordered by Judge Smith had already taken place and the exception in Rule 503(d)(2), N.D.R.Ev., would be applicable to any claimed physician- and psychotherapist-patient privilege. The parents did not renew the objection to the *90 examination on the same bases that they objected at the time of the hearing on the court-ordered examination before Judge Smith.
The parents' reliance upon Interest of R. D. S., supra, was also not well founded. In that decision this court stated:
"We acknowledge the existence of some difficult questions as to the admissibility of evidence in juvenile proceedings. See Interest of R. W. B., 241 N.W.2d 546 (N.D.1976). In a deprivation case, Chapter 27-20, NDCC, requires a two-phased hearing. The same rules of evidence do not apply to both the first phase (sometimes called the adjudicatory hearing), at which the question for decision is whether the child is deprived, and the second phase (sometimes called the dispositional hearing), at which the question for decision is, what will be done for the benefit of the deprived child. It may not be significant in a deprivation case to keep the two phases separated as it would be in a delinquency case where the safeguards described in In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), apply. Perhaps unfortunately, our statutes apply the same procedural rules, regardless of the type of proceedings. There are some unfortunate inconsistencies in the language of the Uniform Juvenile Court Act (Chapter 27-20), the Child Abuse and Neglect Act (Chapter 50-25.1), and Rule 1101(d)(3), NDREv. The board abrogation of all rights, except the attorney-client privilege (Section 50-25.1-10), cannot meet the standards of Gault if applied to the first phase of a delinquency proceeding. The North Dakota Rules of Evidence do not list any provision of either Chapters 27-20 or 50-25.1 as having been superseded, even though it might be argued that Rule 1101(d)(3) is inconsistent with the statutes. Before arguments are made that portions of Chapter 50-25.1 apply to a deprivation proceeding, there should be specific allegations in the petition that the proceedings are pursuant to that chapter and that the prerequisites of that statute are met. Procedures in Chapter 27-20 do apply to abuse and neglect cases brought under Chapter 50-25.1; however, the reverse is not true. It should also be noted that there may very well be a significantly different application of privilege rules to the child, in whose interest the proceedings are brought, and to the mother of that child. The terms `adjudicatory hearing' and `dispositional hearing' are not words from the statute, but are used by social service workers, and are recognized and meaningful terms in some courts. See In Re P. L. H., 86 S.D. 564, 199 N.W.2d 587, 589 (1972), and In Interest of M. L., 239 N.W.2d 289, 293 (N.D.1976)." 259 N.W.2d at 637-638, fn. 1.
The parents appear to have argued in the juvenile court that the physician- and psychotherapist-patient privilege was not abrogated in this proceeding by Section 50-25.1-10, N.D.C.C., because in this case, according to them, the initial termination petition contained no specific allegation that the proceeding was brought pursuant to Chapter 50-25.1, N.D.C.C.
At the time of the hearing before Judge Smith on the court-ordered examination, a petition alleging deprivation was pending in juvenile court. That petition alleged that it was "based upon an investigation by the Grand Forks County Social Service Center and other reliable informants on a complaint of Abuse. . . ." [Emphasis added.] Thus the suggestion in Interest of R. D. S., supra, that the provisions of Chapter 50-25.1 [Child Abuse and Neglect] apply to a deprivation proceeding only if there are specific allegations in the petition that the proceedings are held pursuant to that chapter and that the prerequisites of that statute have been met, was substantially complied with; it is apparent that the petition was based upon a complaint of abuse, and, although that complaint is not part of the record, Mrs. Wy Sheppard testified at the termination hearing that she made the complaint to the Social Service Center of Grand Forks County. The petition for termination of parental rights refers to the existence of the petition alleging deprivation and the proceedings resulting therefrom. Furthermore, *91 notwithstanding the statements in Interest of R. D. S., supra, we do not necessarily conclude that the proceedings under Chapters 27-20 and 50-25.1, N.D.C.C., are entirely different. Chapter 50-25.1 sets forth a method for reporting child abuse and provides certain protections to the persons making such complaints and to the persons investigating those complaints. That chapter contemplates that a report of child abuse, followed by an investigation of that report, might result in proceedings under Chapter 27-20. See Sec. 50-25.1-08, N.D.C.C.
Because the objection to the testimony of Dr. Lipp was based upon Rule 503, N.D.R.Ev., and this court's opinion in Interest of R. D. S., supra, neither of which forms a basis for sustaining an objection to the admission of that testimony, we believe the trial court properly admitted Dr. Lipp's testimony. Whether or not the trial court should have sustained an objection to the admission of Dr. Lipp's testimony on the basis that Judge Smith had no authority to order an examination of the parents by Dr. Lipp, because the parents had not placed their physical or mental condition in controversy, is a question we need not decide.[3] It is true that the parents objected to the examination on that basis in the hearing before Judge Smith, but that was not the basis for their objection to the admission of Dr. Lipp's testimony at the termination hearing before Judge Bakken.

IV
In their fourth issue, the parents question whether the petitioner, Ohlsen, has presented clear and convincing evidence that the causes and conditions of deprivation are likely to continue or will not be remedied. The parents correctly point out that, in order that the court may terminate parental rights, it must find: (1) that the child is a "deprived child" as that term is defined by Section 27-20-02(5), N.D.C.C.; (2) that the conditions and causes of the deprivation are likely to continue or will not be remedied; and (3) that by reason thereof the child is suffering or probably will suffer serious physical, mental, moral, or emotional harm. Sec. 27-20-44(1)(b), N.D. C.C. See also In re H., 206 N.W.2d 871 (N.D.1973). These three factors must all be proved by clear and convincing evidence if the court is to terminate parental rights. See, e. g., In Interest of R. L. D., supra. The parents have not raised on appeal the question whether or not the children were, in fact, deprived, or whether or not by reason of deprivation the children are suffering or probably will suffer serious physical, mental, moral, or emotional harm. We therefore assume that they admit that the children were deprived and that by reason of such deprivation the children are suffering or probably will suffer serious physical, mental, moral, or emotional harm.[4] The contention of the parents is that, absent Dr. Lipp's testimony that the causes and conditions of the deprivation are likely to continue or will not be remedied, the evidence is not sufficient to sustain the conclusion by the trial court to that effect. Although we have already concluded that Dr. Lipp's testimony was properly admitted, we recognize *92 that it is the position of the parents that even with such testimony Ohlsen has failed to prove by clear and convincing evidence that the causes and conditions of the deprivation are likely to continue or will not be remedied. We therefore will review the evidence to determine whether Ohlsen has proved that necessary factor by clear and convincing evidence.
In considering this matter, our scope of review is broader than it is in other cases appealed to this court. Although we give appreciable weight to the findings of the juvenile court, we are not bound by the "clearly erroneous" standard of Rule 52(a), N.D.R.Civ.P., and we re-examine the evidence in a manner comparable to the former trial de novo. See, e. g., Jacobson v. V. S., 271 N.W.2d 562 (N.D.1978); Sec. 27-20-56(1), N.D.C.C.
We have recognized that parents have a constitutional right to the custody and companionship of their children. See, e. g., In re J. Z., 190 N.W.2d 27 (N.D.1971). But we have also held that this right is not absolute and that parents are not entitled to custody of their children under all circumstances. See, e. g., Interest of R. D. S., supra. Parents are entitled to a presumption that they are fit parents, and the burden of disproving this presumption of parental fitness is on the challenger. See, e. g., Bjerke v. D. T., 248 N.W.2d 808 (N.D. 1976). We have noted reluctance to remove a child from the parents unless diligent effort has been made to avoid such separation and we have been sensitive to the argument that it is dangerous to allow social workers to determine how a family is run.[5]Bjerke v. D. T., supra, 248 N.W.2d at 814.
Our review of the testimony presented to Judge Bakken at the termination hearing leads us to conclude that his determination that the causes and conditions of deprivation are likely to continue or will not be remedied is supported by clear and convincing evidence.
Counsel for the parents has categorized the witnesses presented by Ohlsen into five groups: (1) neighbors of the respondents; (2) teachers; (3) foster parents; (4) social workers; and (5) a psychologist. He dismisses the testimony of the neighbors on the ground that it is "stale," i. e., it concerns happenings and events that occurred some two years prior to the termination hearing. He concedes, however, that the testimony of one witness, Ms. Waxvik, who was living next door to the parents at the time of the hearing, was pertinent. While the testimony of previous neighbors may be "stale" when considered by itself, that testimony is revealing when considered together with the testimony of Ms. Waxvik because it presents a repetitive pattern of abuse that did not substantially change during that period.
In addition, Section 27-20-29(4), N.D. C.C., provides that in hearings on the issue of the disposition of a deprived child, "all evidence helpful in determining the questions *93 presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition. . . ."
This court has previously held that this provision "clearly shows that the Legislature intended that the court should consider all relevant evidence bearing upon the issues relating to the proper disposition of the case once the court has determined that a child is a `deprived child.'" In Interest of R. W. B., 241 N.W.2d 546, 553 (N.D.1976). In In Interest of R. W. B., supra, we cited with approval decisions from several other jurisdictions holding that evidence of previous abuse and deprivation may be considered in determining whether deprivation is likely to continue and that the children will probably suffer therefrom.
The testimony of the teachers who taught the children after they were removed from the custody of their parents pursuant to previous hearings was that the children had shown great improvement. The parents argue that any child who had been given the special attention that these children received from the teachers would show great improvement. We cannot, however, dismiss such testimony so lightly because the reason the children were given so much attention was that, according to the testimony of the teachers, they were in need of such attention at the time they came under the tutelage of these teachers. The testimony of the teachers may not be sufficient, of itself, to satisfy the requirement of clear and convincing evidence that the causes of deprivation will continue or would not be remedied in the future, but when considered with the other testimony offered, it surely had probative value.
The parents argue that the testimony of the foster parents should not be given weight with regard to whether or not the deprivation will continue, although they concede it is of probative value in determining whether or not the children were deprived at the time they were received into the foster homes. We agree with the parents, as this court has previously indicated that,
"Evidence which compares the child-rearing skills of the mother and of the foster parents cannot alone form the basis of a finding of harm to the child, provided the mother's efforts meet minimum standards of care." In Interest of R. D. S., supra, 259 N.W.2d at 638.
The parents also argue that testimony from the foster parents concerning continued deprivation should have no weight because the foster parents neither observed the parents nor knew of any attempted improvements by the parents. A review of the testimony reveals that some of the foster parents who testified had little or no contact with the parents and made few, if any, observations regarding continued deprivation. In some instances they were not examined about that issue. However, other foster parents did testify about matters pertinent to that issue. For example, Mrs. Doris Beal, who had D. D. in her home, was asked whether he was given visitation with his parents during the time he was in her home. After answering that there were such visitations, Mrs. Beal was asked how the child would react when he got back to her home after the visits with his parents. In response, she said:
"A. On the night of the visits he would wake up during the night with nightmares and screaming and on one specific time he had woke up in the middle of the night and he was sobbing his heart out and we had to go and love on [sic] him and tell him everything was all right and he would settle back down.
"Q. Are you saying Mam [sic], that on each visit that this child had with his natural parents that during the night of that visit that he would have nightmares and have this crying?
"A. Yes.
"Q. Would he have nightmares and continue to cry other than that one night after the visits?
"A. Sometimes a couple of days and then he would be all right.
"Q. How did the child react on the nights when he did not have visits with his natural parents?
"A. He was fine."
*94 Although such testimony is not conclusive of itself, it is of significance in view of the fact that the children had been removed from their parents' custody some time prior to these events. It has probative value with respect to the issue of whether the deprivation would continue.
Insofar as the testimony of the social workers is concerned, we have previously noted our sensitivity to the argument that it is dangerous to allow social workers to determine how a family is run. See Bjerke v. D. T., supra, 248 N.W.2d at 814. That does not mean, however, that the testimony of social workers should be disregarded. The parents argue that the testimony of the social workers was remote in time and that the parents mistrusted the Social Service Center. We have already held that evidence of previous abuse and deprivation may be considered in determining whether deprivation is likely to continue. See In Interest of R. W. B., supra. The parents testified about their mistrust of the Social Service Center. That testimony is to be considered with the other evidence introduced and given its proper probative value. We do not conclude that the refusal by the parents of certain services offered by the Social Service Center to better the home atmosphere of the parents and their child-rearing capabilities is, of itself, indicative of continuing deprivation. It is, however, another factor which may be considered by the juvenile court and by this court in reaching a decision.
Beverly Bjork, who holds a master's degree in special and language development of small children, was an employee of the Grand Forks County Special Education Board, working to identify children in need of special education and working with the children and parents involved in this proceeding, was asked what would happen to the children if they were returned to the same environment (the parents' home). She responded:
"A. Whatever self-confidence they have established now since they have been out of that home would be destroyed with the kind of verbal abuse that they suffered and whatever physical abuse they suffered, whatever caused their marks on their on their [sic] skins, these children would stop in any area of learning. Their learning would be very minimal after this if they would go back in the same environment in which they were taken from. Their rate of growth in their learning cycle would be extremely limited. They may revert back to their lack of ability to attend to tasks simply because they're more aware of keeping out of the range of someone slapping hands. They have to go back to survival rather than being able to live in an atmosphere in which they don't have to worry about surviving."
Dr. Leland H. Lipp, who is a clinical psychologist and for ten years has been director of the Child Evaluation and Treatment Program at the University of North Dakota Medical Center Rehabilitation Hospital in Grand Forks, holds a Ph.D. in clinical psychology. He testified as follows:
"Q. Do you have an opinion based upon your evaluation of [Mrs. D.] and of her children as to whether or not [Mrs. D.] has the ability to completely raise and care for her children?
"A. Completely raise and care is a relative concept in my thinking. I think the children would be at a definite disadvantage in terms of fulfilling their potential. I think the children would be at a definite disadvantage were they [the parents] to raise them.
"Q. Do you feel that it's in the best interests from your observations that the children not be returned to [Mrs. D.] to have her raise them?
"A. That's my opinion.
"Q. Do you feel that what you observed clinically and what you observed about the [D.] children and of your evaluation of [Mrs. D.] that the problem that [Mrs. D.] has or would have in raising these children would be the type of problems that would continue into the future?
"A. I think it would be.
"Q. Doctor, did you also make an evaluation of [Mr. D.]?

*95 "A. Yes I did.
. . . . .
"Q. Doctor, do you also feel that in the future that [Mr. D.] would not be able to adequately care for his children?
"A. Again the kinds of problems he presented is theoretically remediable but in reality they're very difficult in a very long-term nature to make substantial progress on.
"Q. And, therefore, your opinion would be what, as to whether he could actually take care of these children in the future?
"A. Probably not.
. . . . .
"Q. And then it's your opinion that all four of these children not to be returned to [Mr. D.], is that correct?
"A. That's correct."
This testimony was elicited after questions and answers covering several pages in the transcript were asked concerning Dr. Lipp's contact with the children and their parents and his qualifications to answer those questions. Dr. Lipp also testified that if the parents were involved in an intensive parental training program in general development, it might be possible that they could assume their role of parenting. However, his testimony also revealed that no such intensive program was available in the area and that such a program would be substantial and long-term.
We have previously indicated that if treatment cannot be successfully undertaken in a time frame that would permit the children to return to the parental home without causing a severe dislocation from the emotional attachments that they may form during long-term foster care, parental rights may be terminated even though such long-term care may assist the parents in their problems. Thus, in In the Interest of R. W. B., supra, we stated:
". . . the evidence in the instant case shows that if psychiatric treatment is to be successful, it will of necessity require long-term psychiatric care; that favorable prognosis cannot with any assurance be given at this time; that the parents were responsible for the severe physical abuse of two infant children who were less than one year old at the time that the separate incidents occurred; and that the parents do not yet recognize the seriousness of their actions. Consequently, even if treatment were to be provided and if the parties fully participated therein, it is clear that such treatment would have to extend far beyond the time in which it would be probable that R. W. B. could be successfully assimilated into an improved family environment. In re H., supra, 206 N.W.2d at 875. The prognosis for the parents' future ability to provide proper care for R. W. B., based upon the past history of M. B. and B. B., and upon the psychiatric evidence, is not favorable. Based upon such evidence, we conclude that it is likely that the conditions of deprivation will extend into the future and that it is unlikely that the conditions will be remedied." 241 N.W.2d at 557.
Finally, Irene M. Dybwad, of the Grand Forks County Social Service Center, also was asked if, in her opinion, the deprivation would continue:
"Q. Do you feel in your opinion that they'll be continued to be environmentally deprived if those four children are returned to the home of [Mr. and Mrs. D.]?
"A. Yes I have no reason to believe that there has been any change made in the [parents].
"Q. Why do you think it will continue?
"A. Because [the parents] are still even denying that they ever had a need to change. Change has to occur, you have to believe it or you are putting those children back in the same place of what you were removing them from in the first place."
This court has previously recognized that a failure by the parents to recognize the seriousness of their actions that result in deprivation to their children is evidence that the deprivation is likely to continue. See In Interest of R. W. B., supra.
*96 The parents introduced testimony of two witnesses, JoAnn M. Swenson and Dr. George Lindenfeld, from the Center for Human Development in Grand Forks, from which the parents sought counseling on the advice of their attorney. Ms. Swenson, who holds a degree in religion, testified that after T. D. had been returned to her parents' home, her mother treated her with love and affection and kept her clean. She testified that any deprivation would not be likely to continue. The parents argue, at least as to the question whether or not the deprivation would continue, that Ms. Swenson was a witness whom they trusted. She worked with them after most of Ohlsen's witnesses did. Therefore, the parents argue, her testimony should be given much more weight than the testimony of witnesses who had worked with the parents at an earlier time. Dr. Lindenfeld, who holds a doctorate in child and developmental psychology, testified that no one couple could effectively manage the four children and that, with the help of therapeutic devices, the children could be introduced into the parents' home one by one.
The testimony of Ms. Swenson and Dr. Lindenfeld contradicts that of other witnesses, but that does not mean the evidence that the deprivation is likely to continue is less than clear and convincing. Ms. Swenson and Dr. Lindenfeld entered the picture after initial complaints of abuse and deprivation were filed. They did not have the opportunity to observe the parents with all four children. The testimony of these two individuals is of probative value but it does not alter the conclusion, in our minds, that Ohlsen proved by clear and convincing evidence that the cause of deprivation of these four children was likely to continue.
The order terminating the parental rights of E. D. and V. D. is affirmed.
ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.
NOTES
[1] Examples of the interrogation of witnesses of which the parents complain are as follows:

"By the Court:
"Q. Mrs. Bjork, does your program involve you in any actual work with parents other than to make arrangements and to have their cooperation to participate in these special programs?
"A. Yes. One component of our program is to involve the parents in the setting up of what we call an educational plan for their child and whether we sit down and explain to them the needs of their child and they explain to us what they see the needs for their child at home and together we try to work out a plan that will strengthen those weaknesses. Last year in our program we did have a parent group that met where we worked with the parents of the children to work on any problems that they had come in contact with.
"Q. Well the laws of the state and the criteria that has been established requires a determination, you know, whether first that children are deprived and the next step is whether the deprivation is likely to continue. That's where the parents come in.
"I guess it  at least in my mind it is  should be obvious to anyone, if no one else has control over these children from birth, that's where the initial deprivation came from but I'm asking you whether in your opinion in this case there is any reasonable likelihood whether the deprivation will continue. First, do you have an opinion?
"A. An opinion?
"Q. Whether the deprivation is likely to continue?
"A. In these children in the natural setting?
"Q. Yes.
"A. Yes.
"Q. You do?
"A. I have an opinion on that.
"Q. What is it?
"A. I feel that if they go back to their natural parents it will continue. They have been deprived to such a great extent it's very difficult to change the types of things that have happened to them and to change the way their parents treat them.
"Q. And when you give that opinion and use the explanation that it's very difficult to change the situation, are you relating that to what you have observed and know about the situation as distinguished, you know, from well numerous other family situations?
"A. From both. From what I have observed of the . . . family, the children and the parents and the home and from my experience with other children that have come from homes similar to this and then have been placed back in their home and what those children  how those children function after they were in that home a second time.
. . . . .
"By the Court:
"Q. Dr. Lipp, is it your testimony if I have these notes right that [Mrs. D.] had an IQ score of 82, performance of 101, and fullscale 90?
"A. Verbal IQ of 82.
"Q. What does that performance consist of?
"A. The performance skills of that test relate to nonverbal types of intellectual factors. Eye, hand coordination[,] things in abstract, nonverbal contracts [sic]. So it's in a sense less related to educational achievement because it's not directly connected with our language system. It relates more to need of intelligence.
"Q. Is it a test that is given in writing or on paper or is it something that the person is asked to do and to perform?
"A. This is a little different. Some you put blocks together to match a picture or a concept, others a paper and pencil task. Others they're asked to look at pictures and respond verbally. So there are different subtests.
"Q. In the performance category?
"A. Right.
"Q. According to my notes, change is not usually forthcoming unless a very intensive long-term program is initiated?
"A. Yes.
"Q. And really unless you're in a position to implicate tutors, you know, for well the lifetime perhaps and unless you have the financial means and resources to do that, do you know of any program in this country that's available?
"A. No.
"Q. I [sic] never heard of any?
"A. No.
"Q. It would mean adult education, special adult education is really what it would mean?
"A. That's correct.
"Q. And we're just beginning to make some progress in special education for children, aren't we, in North Dakota?
"A. That's right.
"Q. That's public special education?
"A. Public special education, that's correct.
"Q. And would you agree that even if the public, the taxpayers were willing to pay the price, that would mean that you could overcome adult resistance to going back and doing the concentrated things and putting in the concentrated effort that it would take to accomplish anything by special education?
"A. We're talking about a multitude of factors and that's quite correct.
"Q. And it would be a big obstacle?
"A. I think it would be, yes, sir.
"Q. Because you have established these patterns over a lifetime and you've gotten by after a fashion and this is your  it's really all you know, isn't it?
"A. It's a very ingrained habit pattern, yes.
"Q. I don't know if I've listed all the items you specified when you were speaking of the accumulative evidence of diminished capacity to raise children properly. I [sic] have noticed her marginal intelligence?
"A. Yes.
"Q. Poor judgment?
"A. Yes.
"Q. Poor work history?
"A. Yes.
"Q. Which ones did I miss?
"A. I have to think about this for a second. Impulsivity, generally marginal personality characteristics.
"Q. Could you define that?
"A. Immaturity, general impulsivity, generally to become more impulsive under stress."
[2] Rule 503(d)(2), N.D.R.Ev., provides:

"If the court orders an examination of the physical, mental, or emotional condition of a patient, whether a party or a witness, communications made in the course thereof are not privileged under this rule with respect to the particular purpose for which the examination is ordered unless the court orders otherwise."
[3] We do not conclude that whenever a petition for termination of parental rights is served, the court may require the parents to submit to a physical and mental examination under Rule 35, N.D.R.Civ.P. Judge Smith determined that the parents "exercised their right to claim a privelege relative to their own independent evaluation, and have chosen not to make the result of said evaluation available to the Court,. . ." In fact, the persons who made the evaluation at the request of the parents did testify at the hearing on termination as to the mental and emotional condition of the parents. For a discussion of the application of Rule 35, F.R.Civ.P., which is identical with Rule 35, N.D. R.Civ.P., see Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964).

The parents have raised no constitutional argument in this appeal.
[4] It would serve no useful purpose to iterate here the testimony, some of which was repetitive, as to the abuse of the children. Our reading of the transcript of testimony at the termination hearing does lead us to conclude that the children were "deprived" within the meaning of Section 27-20-02(5), N.D.C.C., and that by reason of such deprivation the children are suffering serious physical, mental, moral, and emotional harm.
[5] We have also stated that in a derivation or termination proceeding the best interest of the child is not the primary question before the court. See, e. g., Interest of R. D. S., supra; In Interest of M. L., 239 N.W.2d 289 (N.D.1976). This statement does not, however, suggest that the interests of the child are not considered. On the contrary, Section 27-20-01, N.D.C.C., requires that we interpret the Uniform Juvenile Court Act to "provide for the care, protection, and wholesome moral, mental, and physical development of children coming within its provisions;" and "To provide a simple judicial procedure through which [the Uniform Juvenile Court Act] is executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced; . . ." Thus our statements in previous cases that the best interest of the child is not the primary factor to be considered in termination proceedings mean merely that the three factors set forth in Section 27-20-44(1)(b), N.D.C.C., must be proved by clear and convincing evidence to justify termination of parental rights. Although it is not sufficient for the court to find that the best interest of the child would be better served by termination of parental rights and placement of the child in another home, it is apparent that the best interest of the child must be considered in examining these three factors. In a case involving a dispute as to custody of the child between parents, the best interest of the child is the primary factor. See, e. g., Keator v. Keator, 276 N.W.2d 135 (N.D.1979).