STATE of North Dakota, Plaintiff and Appellee,

v.

Gregory LIND, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Raymond CARROLL, a/k/a Buster Carroll, Defendant and Appellant.

Cr. Nos. 791, 792.

Supreme Court of North Dakota.

July 30, 1982.

Thomas H. Falck, Jr., Asst. State's Atty., Grand Forks, for plaintiff and appellee State.

Bruce E. Bohlman, of Murray, Olson, Larivee, Bohlman & Engen, Grand Forks, for defendant and appellant Lind.

Richard A. Ohlsen, of Mack, Moosbrugger, Ohlsen & Dvorak, Grand Forks, and C. Michael Winters, New Orleans, La., for defendant and appellant Carroll; argued by C. Michael Winters, New Orleans, La.

VANDE WALLE, Justice.

Raymond Carroll and Gregory Lind appealed from the respective judgments of conviction for the offense of conspiracy to deliver a controlled substance and also appealed from the denial of their motions for acquittal [Rule 29, N.D.R.Crim.P.], for a new trial [Rule 33, N.D.R.Crim.P.], and for

arrest of judgment [Rule 34, N.D.R.Crim. P.]. We affirm.

Carroll and Lind are two of four defendants who were charged with the offense of conspiracy to deliver a controlled substance. The other two defendants, Harry Blevins and Michael Burstad, pleaded guilty to the same charge and the disposition of the criminal charges against them is not part of this appeal. The evidence presented at trial revealed the following series of events:

—An agent of the Drug Enforcement Unit of North Dakota negotiated with Burstad for the purchase of one pound of cocaine. Burstad testified that Lind contacted a person in Florida to supply the cocaine. Because Burstad did not know the person in Florida, Lind advised Burstad of the progress in obtaining and transporting the cocaine to Grand Forks. Burstad provided Lind with almost half of the money that was needed to transport the cocaine from Florida. Burstad testified that he gave the money to Lind, who wired it to a motorcycle shop in Florida so that the transfer of money would look like a payment for motorcycle parts.

—Burstad also testified about the details of transporting the cocaine. Lind told him that two men would arrive in Grand Forks, one arriving a day before the other. When the first man arrived, Burstad found out from Lind that he was staying in Hillsboro. When Burstad later met the man he learned that his name was Harry Blevins.

—Blevins arrived in Grand Forks by airplane on October 18, 1980. At the airport watching the passengers deplane was another agent of the Drug Enforcement Unit. This agent had been requested by the agent negotiating the purchase to watch the airport the evening of October 18, 1980. Burstad had told the agent that he would have to go to the airport the evening of October 18 to pick up the man from Florida who was bringing the cocaine. The agent at the airport was waiting to see if Burstad would meet anyone arriving on the plane. When Burstad did not appear the agent watched the people departing from the plane. According to the agent two people "struck out." One left the terminal in a taxi. This person was subsequently eliminated from suspicion. The other person, later identified as Blevins, went to the airport bar. After some time the agent went into the bar and sat within ten to twelve feet of Blevins. The agent overheard Blevins's conversation and learned that Blevins was having problems finding a vacant motel room in Grand Forks. When the agent heard the barmaid suggest that Blevins call Hillsboro for a room, the agent offered Blevins a ride because the agent had to travel to Fargo that night, anyway. Blevins accepted the offer. On the way to Hillsboro, Blevins offered the agent a substance the agent believed to be cocaine. The conversation during the trip centered around drugs and that Blevins and others were selling drugs in North Dakota. Blevins also told the agent that his partner was flying in the next night. The agent offered to give Blevins a ride to Grand Forks the next day, Sunday, October 19, 1980. During a conversation the next day when the agent stopped in Hillsboro to give Blevins a ride to Grand Forks, Blevins described his partner as a "one-eyed biker." Blevins ultimately refused the agent's offer of a ride to Grand Forks. A third agent, assigned to watch the motel in Hillsboro, saw a person, later identified as Lind, pick up Blevins. The agent followed the van containing Lind and Blevins to Burstad's apartment in Grand Forks.

—Burstad testified that he, Lind, Blevins, and another man were at his apartment on Sunday afternoon, October 19, 1980. Blevins told Burstad that he would not release the package of cocaine until "Buster" arrived. Raymond Carroll's nickname is Buster. Contrary to what Blevins had told the agent during the drive from Grand Forks to Hillsboro the night before, Blevins apparently had the cocaine with him. Burstad testified that at his apartment he was sure that Blevins had the cocaine with him because the room they were sitting in smelled of cocaine.

—Burstad also testified that he knew Buster would be arriving the day after

Blevins arrived and on the same flight that Blevins arrived. It was decided that afternoon, Sunday, October 19, 1980, in Burstad's apartment that Lind would go to the airport and pick up Carroll. Burstad had told the agent making the purchase that another man would be arriving on the 8:15 p. m. flight from Chicago. In the meantime, Blevins checked into a motel in Grand Forks, the same motel in which the drug-enforcement agents had set up headquarters. When the 8:15 flight from Chicago arrived, Lind was there to meet Carroll. When Lind and Carroll left the airport they were arrested, advised of their rights, and taken to the Grand Forks County jail. At the jail Lind was "asked" to call Burstad to tell him that Carroll was arrested for possession of marijuana and that they both were being held. When Burstad learned of the arrests he called Blevins and suggested that he pack his bags. However, when the agent called to determine how the deal was progressing, Burstad indicated that the purchase might still be completed even though Lind and Carroll had been arrested. Burstad then left town. He was arrested approximately one month later in Hillsboro when he was concluding a sale of drugs to an agent of the Drug-Enforcement Unit.

—At the county jail the wallets of both Lind and Carroll were searched. In Lind's wallet was found a picture on the back of which was written "Buster," a telephone number, and "Florida, home." Also found in Lind's wallet was a receipt for a Western Union Telegraph money order for $1,530.40 addressed to "Master Cycle, c/o Buster." Greg Lind is listed as the person sending the money order. From Carroll's wallet was taken a card which had written upon it "Greg Lind," a telephone number, and "Grand Forks, N.D."

—Later in the evening of Sunday, October 19, 1980, the agent who had given Blevins a ride to Hillsboro called Blevins at his room in the Grand Forks motel. The agent invited Blevins to the agent's room for a drink. When Blevins entered the room he was arrested. The agent asked Blevins if he could search Blevins's room, and Blevins consented. A search of Blevins's room produced approximately five ounces of cocaine.

—At trial both Blevins and Burstad testified, as did the agents of the Drug Enforcement Unit who were involved in the negotiation of the sale and the arrests of all of the defendants. Lind and Carroll were tried jointly and each was found guilty by a jury of conspiracy to deliver a controlled substance. Although each has appealed from his separate judgment of conviction, many of the issues raised by Carroll and Lind are identical. Therefore, we will address their appeals in one opinion.

. The first issue was raised by Lind alone. He argues that denial of his motion for a separate trial, pursuant to Rule 14, N.D.R. Crim.P., was error. Rule 14 states:

"If it appears that a defendant or the prosecution is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together, the court may ... grant a severance of defendants or provide whatever relief justice requires...."

The purpose of Rule 14 is "to promote economy and efficiency and to avoid a multiplicity of trials, where these objectives can be achieved without substantial prejudice to the right of defendants to a fair trial. [Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ] ... [T]he general rule is that public policy considerations in the administration of justice require that the severance be denied in the absence of a clear-cut showing of prejudice against which the trial court will not be able to afford protection." Explanatory Note, Rule 14, N.D.R.Crim.P. We stated in State v. Erickson, 231 N.W.2d 758, 763 (N.D.1975), that we do not set aside a trial court's refusal to grant a separate trial unless it is shown that there has been a clear abuse of discretion. In Erickson and State v. Whiteman, 79 N.W.2d 528 (N.D. 1956), where the defendant's request in each case for a separate trial was refused, neither defendant made a showing that he would be prejudiced by a joint trial nor had he made a showing that a codefendant

would testify for him if a separate trial were granted. *Erickson, supra,* 231 N.W.2d at 763.

When Lind made his motion to sever the trials there were four defendants. When the trial judge denied the motion one codefendant had pleaded guilty. Only two defendants were tried jointly.

Lind has done more here than merely state that the trial must be separated in order to prevent prejudice. Lind argued that the jury would not be able to separate the evidence against each of the defendants. He also argued that there would be a spill-over effect of evidence submitted against one defendant upon the other defendant. These arguments had more weight when there were four defendants and there existed the possibility that a defendant would be unable to defend due to inability to obtain the testimony of a codefendant. Lind also argued in his brief to the trial judge that because there might be testimony from a codefendant there would be undue pressure placed against him to also take the witness stand, thereby depriving him of his right to not testify.

Although the presentation of the conspiracy wove an intricate tale of the actions of the four conspirators, we do not believe that the jury was unable to separate the evidence against Lind and Carroll. The role each played in the conspiracy was separated geographically, functionally, and, to some extent, by time. Lind was involved near the beginning of the conspiracy and contacted Carroll to supply the cocaine. Carroll obtained the cocaine, arranged transportation to Grand Forks, and then traveled to Grand Forks to conclude the transaction. Lind met Carroll at the airport in order to bring Carroll and Burstad together to conclude the purchase. Likewise, the evidence submitted against Lind and Carroll might have "spilled over" to the other only to establish the existence of the conspiracy. As to their individual roles in the conspiracy, we do not believe that the evidence presented against one necessarily was used by the jury against the other. Generally, where proof of the conspiracy is based upon the same evidence and facts, codefendants should be tried together. *United States v. Jackson,* 549 F.2d 517, 523 (8th Cir. 1976). We also note that Lind did not attempt to show that by obtaining a separate trial, he could obtain the testimony of Carroll. We conclude the trial court did not abuse its discretion in denying Lind's motion for a separate trial.

Carroll and Lind next raise the issue that the trial court improperly denied a motion to suppress evidence. Both sought to suppress the cocaine obtained as a result of the search of Blevins's motel room, the documents taken from Lind's and Carroll's billfolds while they were at the Grand Forks jail, and the telephone records of Lind.

The search of Blevins's motel room occurred subsequent to his arrest in the room used by the agents of the Drug Enforcement Unit. After he was arrested the agents took him to his room and asked if they could search his room. Blevins consented to the search. During the search the agents found the cocaine which Blevins brought from Florida. Both Carroll and Lind claim that they have standing to object to the search of Blevins's room under the automatic-standing rule.

The automatic-standing rule, announced in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), gave a defendant charged with crimes of possession based upon possession of seized goods automatic standing to challenge the legality of a search which produced the evidence against him. The automatic-standing rule applied regardless of whether or not the defendant had an expectation of privacy in the premises searched. *United States v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619, 623 (1980). The decision in *Salvucci* overruled the automatic-standing rule of *Jones.* "Today we hold that defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated." *Salvucci,* 448 U.S. at 85, 100 S.Ct. at 2549, 65 L.Ed.2d at 623. Our decisions in *State v. Fischer,* 270 N.W.2d 345 (N.D.1978), and *State v. Mat-*

*thews,* 216 N.W.2d 90 (N.D.1974), were based upon *Jones.* In *State v. Klodt,* 298 N.W.2d 783, 786 (N.D.1980), we said that we need not decide whether to follow *Fischer* and *Matthews,* which adhered to the automatic-standing rule, or to follow the rationale in *Salvucci,* which abandoned the automatic-standing rule. The reason we did not have to decide was that the defendant in *Klodt* was not charged with a possessory crime. *Klodt,* 298 N.W.2d at 786. The automatic-standing rule was applied to defendants who were charged with possessory crimes. In the instant cases, neither defendant is charged with a possessory crime but with conspiracy to possess and deliver a controlled substance. However, an element of the charged crime is an overt act and the overt act alleged in the criminal complaint was possession of cocaine. This is sufficiently analogous to a possessory crime for us to determine the continued viability of the automatic-standing rule. This appeal presents the issue which we did not have to discuss in *Klodt.*

At the time that Blevins's room was searched, the automatic-standing rule of *Fischer* and *Matthews* was the law in this State. Since *Fischer* and *Matthews,* the United States Supreme Court has overruled the automatic-standing rule. It is within the power of this court to apply higher constitutional standards than are required of the States by the Federal Constitution. *Matthews,* 216 N.W.2d at 99. However, for the reasons stated in *Salvucci,* we believe that it is no longer desirable to continue the automatic-standing rule. See *State v. Klosterman,* 317 N.W.2d 796 (N.D.1982).

■ Neither Lind nor Carroll had an expectation of privacy in Blevins's room. They do not claim that they were cotenants with Blevins. The search by the drug-enforcement agents did not violate any of their Fourth Amendment rights. We believe that "[i]t is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the [exclusionary] rule's protections." *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

Both Carroll and Lind have argued that the circumstances under which Blevins gave his consent to a search of the room were coercive. Because we decide that neither Carroll nor Lind had an expectation of privacy in Blevins's room we do not address the circumstances under which Blevins gave his consent.

Carroll and Lind next contest the denial of the motion to suppress documents taken from their billfolds while they were in custody at the Grand Forks County jail. The documents taken were a picture with the name "Buster" and a phone number on the back, a Western Union money order receipt for approximately $1,500 made out to Buster Carroll, and a piece of paper with the name Greg and a phone number on it.

There was no warrant to arrest Lind and Carroll or to search their possessions at the jail. Searches made without a valid search warrant are unreasonable unless they are shown to come within one of the exceptions. *State v. Matthews,* 216 N.W.2d 90, 99 (N.D. 1974). Because the State attempts to justify the seizure of these documents as within the search-incident-to-arrest exception, we first determine whether or not the arrest of Lind and Carroll was valid.

■ One of the situations in which an arrest may be made without a warrant is when a law-enforcement officer has probable cause to believe that the arrested person committed a felony. Sec. 29–06–15(1–c), N.D.C.C.; *Hardy v. Cunningham,* 167 N.W.2d 508, 511 (N.D.1969). Probable cause to support a warrantless arrest "exists when the facts and circumstances within a police officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution in believing that an offense has been or is being committed. [Citations omitted.]" *State v. Phelps,* 286 N.W.2d 472, 476 (N.D.1979).

■ Here, the arresting officers knew: of the existence of the plan to purchase cocaine; that one courier, Blevins, had arrived; that another courier was to arrive on the same flight the next night; that Lind

gave Blevins a ride from Hillsboro to Grand Forks; and that Lind met at the airport the person described as the one without whom Blevins would not deliver the cocaine. At oral argument the State said that until Lind met Carroll at the airport, there was not enough probable cause to arrest Lind. The probable cause to arrest Lind results from his transporting Blevins to Burstad's apartment in Grand Forks *and* also meeting Carroll at the airport. Contrary to Lind's argument that he was merely providing taxi service, combining the two events with two key people known to be involved with the drug transaction was sufficient probable cause. Probable cause must be more than a mere suspicion but need not be the same standard of certainty necessary to convict a defendant. As to Lind, we believe that probable cause to arrest existed at the time he was arrested.

■ When Carroll departed the plane he was met by Lind. Although the drug-enforcement agents expected Carroll to be transporting the remaining cocaine, the fact that he was not has no effect on the probable-cause issue. The agents knew that Carroll resembled the description given by Blevins as the man without whom the transaction could not be completed. When he was met at the airport by Lind the additional details of the conspiracy became apparent. Until Carroll was arrested the agents did not know his name. As with Lind, until the two men met at the airport there was no probable cause to arrest Carroll and no basis for obtaining an arrest warrant. We believe that probable cause also existed to arrest Carroll at the airport.

Having decided that the arrest was valid we turn to the warrantless search of Carroll's and Lind's billfolds and the seizure of documents from them. One of the recognized exceptions to the requirement of a search warrant is that a search may be made incidental to a valid arrest. *State v. Page*, 277 N.W.2d 112, 117, fn. 2 (N.D.1979); *State v. Gagnon*, 207 N.W.2d 260, 263 (N.D. 1973).

Under *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973),

there would be no question as to the validity of the seizure of the documents if they had been found on or in the clothing of Lind or Carroll: "The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." 414 U.S. at 234, 94 S.Ct. at 476, 38 L.Ed.2d 439–440. "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." 414 U.S. at 235, 94 S.Ct. at 477, 38 L.Ed.2d at 440–441. In *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the Court decided similarly that a postarrest seizure of clothing from a defendant was reasonable. "While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence." *Edwards*, 415 U.S. at 808–809, 94 S.Ct. at 1240, 39 L.Ed.2d at 778, quoting *United States v. DeLeo*, 422 F.2d 487, 493 (1st Cir. 1970). The Court in *Edwards* stopped short of holding that all postarrest searches were reasonable. "In upholding this search and seizure, we do not conclude that the Warrant Clause of the Fourth Amendment is never applicable to postarrest seizures of the effects of an arrestee." At this point the Court explained in footnote 9: "Holding the Warrant Clause inapplicable in the circumstances present here does not leave law enforcement officials subject to no restraints. This type of police conduct 'must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.'

. . . But the Court of Appeals here conceded that probable cause existed for the search and seizure of respondent's clothing, and respondent complains only that a warrant should have been secured. . . ." 415 U.S. at 808, 94 S.Ct. at 1239, 39 L.Ed.2d at 778.

Although the State seeks to justify the search and seizure on the basis of a search incident to an arrest, we need not base our decision solely on that ground.[1]

We thus consider whether or not the search and seizure is within the inventory-search exception to the warrant requirement. We recently decided that an inventory search of the wallet of a person who was detained for detoxification was reasonable in order: to protect the detainee's property while it remains in police custody; to protect the police against claims and disputes over lost or stolen property; and to protect the police from danger. *State v. Gelvin*, 318 N.W.2d 302, 305 (N.D.1982). The same three interests exist as well when a person has been lawfully arrested.

█ Carroll and Lind argue that the drug-enforcement agent was only looking for evidence and therefore the search was invalid. It is arguable that such a purpose may fall within the language of *United States v. Robinson* and *United States v. Edwards, supra.* We addressed a similar argument in *Gelvin.* Gelvin argued that the search was not an inventory search but merely a pretext search conducted to discover evidence of a crime. We said the search was reasonable because there was "ample evidence indicating that the inventory search of Gelvin's possessions was conducted pursuant to standard jailhouse procedures." *Gelvin*, 318 N.W.2d at 307. In the instant cases there was not ample evidence but there was unrebutted testimony that the search was conducted in order to inventory the contents of the wallets.

The drug-enforcement agent who seized the documents from the billfolds testified on cross-examination:

"Q. You were looking for evidence yourself though.

"A. Yes, I was.

. . . . .

"Q. That you were basically going through Mr. Carroll's wallet looking for evidence.

"A. No, like I said, it was a two-part purpose; to conduct an inventory and also to look for any evidence that would be pertinent.

. . . . .

"Q. Now, you stated, I believe your testimony was it more or less an inventory. In other words, your activities there were more than just the inventory that the deputy himself was performing. You had an investigatory phase in there yourself for your own interest.

"A. Yes, I had an interest also."

Carroll and Lind point to this as demonstrating that the search and seizure of the documents was improper.

█ We do not believe that the resultant seizure of documents from the wallets of Carroll and Lind was unreasonable because the drug-enforcement agent had a dual purpose. It is sufficient that the wallets were being inventoried. After the drug-enforcement agent testified the search was an inventory search no evidence was presented to indicate that inventorying the wallets of arrested persons at the Grand Forks County jail was not a standard jailhouse procedure. The inventory search being reasonable, we cannot agree that incriminating evidence discovered as a result must be suppressed. Had the jailer alone found obvious evidence of an illegality such as contraband, we cannot expect that he or

1. We recognize that other courts have interpreted the broad language of *United States v. Robinson* and *United States v. Edwards* to permit postarrest searches and seizures, similar to the one conducted here, as searches incident to arrest. *State v. Nesmith*, 40 N.C.App. 748, 253 S.E.2d 594 (1979) [search and inspection of the contents of the wallet of defendant at the police station was valid as incident to lawful arrest], and *Cave v. State*, 360 So.2d 3 (Fla.App.1978) [postarrest search of defendant's wallet during inventory of personal effects which revealed contraband held valid as a search incident to a lawful arrest].

the State should ignore it solely because it was found during an inventory. Because someone was present who recognized contents of the wallets as being relevant to the arrests while assisting the jailer does not require the suppression of the documents seized. To so require would lead to ludicrous results and require the State to inventory with its eyes closed to the items being inventoried. Cf. *People v. Robinson*, 388 Mich. 630, 202 N.W.2d 288 (1972). We decide that the search and seizure in the instant case is within the inventory-search exception to the warrant requirement.[2]

Lind also argues that the denial of his motion to suppress telephone records was error. Through the Attorney General a subpoena was served upon the telephone company which serviced Lind's telephone. The subpoena directed the telephone company to deliver the name, address of subscriber, and all available long-distance toll information through October 31, 1980, for a telephone number, later identified to be Lind's. The subpoena was issued pursuant to Rule 17(a)(2), N.D.R.Crim.P.

Lind argues that he has an expectation of privacy in the phone records of the telephone company which indicate what calls he has made and that because he has an expectation of privacy a search warrant should have been obtained and that the procedure through which the subpoena was served is improper. Lind also argues that under Rule 17(c), N.D.R.Crim.P., information obtained as a result of such a subpoena must be turned over to the court and there must be an opportunity to quash a subpoena and an opportunity to examine the information actually subpoenaed.

We believe that Lind misreads Rule 17. Rule 17(a)(2) states:

"(2) A subpoena (other than a subpoena to secure the attendance of a witness for deposition) or a subpoena for the production of documentary evidence or objects, may also be issued by the attorney for a party to any proceeding in the name of the court in like manner and with the same effect as if issued by the clerk or magistrate. Such subpoena shall be subscribed in the name of the attorney, together with his office address, and shall identify the party for whom he appears."

Rule 17(c) states:

"(c) *For Production of Documentary Evidence and of Objects.* A subpoena may also command the person to whom it is directed to produce the books, papers, documents, or other objects therein designated. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents, or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time they are offered in evidence and may upon their production permit the books, papers, documents, or objects or portions thereof to be inspected by the parties and their attorneys."

These provisions permit an attorney to issue a subpoena so long as he follows the procedures described in the rule. Rule 17(c) allows a court to quash or modify the subpoena "if compliance would be unreasonable or oppressive." This permits the person required to produce documents, books, papers, etc., to object to the subpoena. This portion of the rule does not permit the party against whom the evidence

**2.** Some courts have upheld similar searches under both the search-incident-to-arrest and the inventory-search exceptions. *United States v. Matthews*, 615 F.2d 1279 (10th Cir. 1980) [search of the defendant's wallet after it had been inventoried in order to find identification and finding a vehicle-registration form was upheld as both a search incident to an arrest and as part of the necessary inventory of an accused's personal property]; *accord, United States v. Gardner*, 480 F.2d 929 (10th Cir.

1973), and *People v. Brooks*, 405 Mich. 225, 274 N.W.2d 430 (1979) [court upheld seizure of folded paper inside defendant's stocking which became apparent during an inventory search; it was reasonable to unfold the paper to determine what was being inventoried because it could have been a negotiable instrument or something else of value; and it was reasonable to look in the folded paper for small but dangerous objects, for drugs, or for other contraband].

may be used to contest the subpoena. Lind, however, was able to contest the documents produced as a result of the subpoena at the hearing on his motion to suppress evidence.

■ We do not agree with Lind's argument that he had an expectation of privacy in the telephone records and therefore a search warrant should have been obtained. The keeping of these kinds of records is a necessary part of the telephone company's business. The records of the telephone company kept in the ordinary course of the company's business should be treated like the records of any other business. *United States v. Covello*, 410 F.2d 536, 542 (2d Cir. 1969). See *United States v. Kohne*, 347 F.Supp. 1178 (W.D.Pa.1972); *United States v. Re*, 313 F.Supp. 442 (S.D.N.Y.1970). Because we decide that Lind did not have a reasonable expectation of privacy in the telephone company's records he may not complain of the lack of a search warrant.

The third issue raised is whether or not the trial court erred when it denied a motion for a mistrial. The State's first witness was the drug-enforcement agent who had been negotiating for the purchase of the cocaine. Part of his testimony related to statements made to him by Burstad after Blevins, Lind, and Carroll had been arrested. The agent related what Burstad told him about the roles Lind and Carroll played in the conspiracy. Initially the trial judge allowed the statements as an exception to the rule against hearsay, Rule 801(d)(2), N.D.R.Ev.: "The statement is offered against a party and is . . . (v) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Lind and Carroll objected because Burstad's statements to the drug-enforcement agent were made after the conspiracy had ended. During Lind's cross-examination of the drug-enforcement agent, but while in the judge's chambers on another matter, the trial judge reversed his prior ruling and decided that the statements of the drug-enforcement agent relating what Burstad had said after the conspiracy had ended should not have been admitted. The trial judge decided that his admonishing the

jury to disregard the drug-enforcement agent's statements relating to the conversation with Burstad, which occurred after the conspiracy had terminated, would be sufficient. Although the record does not reflect that Carroll joined in Lind's motion for a mistrial, he did participate in the discussion of the motion with the trial judge, the State, and Lind. Because the motion, if granted, would affect Carroll also, in this circumstance we will not consider that Carroll has waived his right to raise the denial of the mistrial motion on appeal because of his failure to specifically object.

Carroll does not cite any case law which would support his argument that it was error for the trial judge to deny the motion for a mistrial. His argument is that because a law-enforcement officer made the statement, the jury would be unable to disregard that portion of his testimony which was erroneously admitted. Similarly, Lind argues that fundamental fairness under the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution requires that the judgment be reversed.

■ Rule 52(a), N.D.R.Crim.P., provides that an error is harmless if it does not affect the substantial rights of the defendant. *State v. Helgeson*, 303 N.W.2d 342, 346 (N.D.1981). Upon a showing that a defendant's substantial rights have been denied, the defendant is entitled to reversal. *State v. Faul*, 300 N.W.2d 827, 833 (N.D. 1980). However, where the error violates a constitutional right of a defendant, the prosecution must prove the error was harmless beyond a reasonable doubt. *Faul, supra*, 300 N.W.2d at 833. This is not such a case. The burden of showing error is upon the party alleging it. *Brissman v. Thistlethwaite*, 49 N.D. 417, 192 N.W. 85, 87 (1922). Because similar evidence was submitted later in the trial repeating the testimony of the drug-enforcement agent which the jury was instructed to disregard, we do not believe that the trial judge erred when he denied the motion for a mistrial. The importance of the statements by the drug-enforcement agent was that they showed

the connection between the four people charged and their roles in the cocaine transaction. There was sufficient evidence in the trial which accomplished the same result. Therefore, the judge's actions did not serve to prejudice the defendants nor affect the substantial rights of the defendant. *United States v. Iron Shell*, 633 F.2d 77 (8th Cir. 1980), *cert. denied* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981).

The fourth issue is whether or not the trial court erred by allowing any hearsay testimony of the drug-enforcement agent who had agreed to purchase the cocaine. This issue is different from the third issue because the testimony contested in this issue was permitted according to the rule which allows statements made by a co-conspirator during the course of and in furtherance of the conspiracy. Rule 801(d)(2)(v), N.D.R.Ev. Before the trial judge could rule that the agent's testimony was an exception to the rule against hearsay he was required to determine whether or not a conspiracy existed. Rule 104(a), N.D.R.Ev., provides:

"(a) *Questions of Admissibility Generally.* Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence, shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges."

We agree with the approach taken by the Eighth Circuit in *United States v. Bell*, 573 F.2d 1040 (8th Cir. 1978), where the Court was faced with the same issue. Rule 801(d)(2)(E), F.R.Evid., like our Rule 801(d)(2)(v), permits an out-of-court declaration of a co-conspirator "if the government demonstrates (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy." *Bell, supra*, 573 F.2d at 1043. Before the hearsay statements may be used

the trial judge must determine that the above three facts exist. "Accordingly, we hold that an out-of-court statement is not hearsay and is admissible if on the independent evidence the district court is satisfied that it is more likely than not that the statement was made during the course and in furtherance of an illegal association to which the declarant and the defendant were parties." *Bell, supra*, 573 F.2d at 1044. It is important to note that the Eighth Circuit required evidence independent of the proposed hearsay evidence. By requiring independent evidence the Court prevented the Government from "bootstrapping" the admissibility of the hearsay evidence. It is also important to recognize the standard of proof to which the court is held. The court need only be satisfied that there is a preponderance of the evidence to establish the three elements listed above. The *Bell* Court chose the more-likely-than-not test because the court is ruling on admissibility rather than guilt. *Bell, supra*, 573 F.2d at 1044.

The *Bell* Court did not require that the Government meet this burden prior to presentation of the hearsay evidence but permitted the Government to prove the three elements throughout the course of the presentation of its case. At the end of all the evidence the court is required to make an "explicit determination for the record regarding the admissibility of the statement; and ... if the court determines that the government has failed to carry the burden ... the court will, upon appropriate motion, declare a mistrial, unless a cautionary instruction to the jury to disregard the statement would suffice to cure any prejudice. [Citation omitted.] The foregoing procedural steps should transpire out of the hearing of the jury." *Bell, supra*, 573 F.2d at 1044.

The procedure outlined in *Bell* is primarily the one the trial court followed in the instant case. In addition, the trial judge cited authority [3] which indicated that he could use prior proceedings, such as pre-

**3.** 1 *Weinstein's Evidence* at 104–44.1 to 104–44.2.

trial procedures and suppression hearings, to determine the existence of the three elements. We believe that the trial judge was correct in considering evidence presented at those pretrial proceedings.

■ Although *Bell* permits the trial judge to withhold his decision on the admissibility of the hearsay evidence until the end of all the evidence, the trial judge here made his decision during the testimony of the agent from whom the hearsay evidence was being elicited. The fact that the trial judge made his decision on the admissibility of the hearsay evidence during the presentation of that evidence does not affect our decision on this issue. The trial judge could have waited until the end of all the evidence. That he did so earlier is not error. Therefore, we decide that the trial judge did not err when he permitted, pursuant to Rule 801(d)(2)(v), N.D.R.Ev., the testimony of the drug-enforcement agent.

■ The fifth issue was raised by Carroll alone. Carroll appears to be arguing that testimony by one of the drug-enforcement agents should not have been admitted because the testimony included a post-conspiratal hearsay declaration. The agent testified to a conversation he had with Lind and that he requested Lind to call Burstad and tell him that Carroll had been arrested at the airport for possession of marijuana. We do not believe that the testimony objected to by Carroll is hearsay. The testimony consisted of statements the drug-enforcement agent made to Lind after Lind was arrested. Because the declarant, the drug-enforcement agent, was present at trial, under oath, and subject to cross-examination, his testimony relating what he requested Lind to do was not hearsay. Although Carroll is less than clear, it appears he may be arguing that the agent's testimony about what Lind did when asked to make a telephone call to Burstad, is hearsay. The State argues that the testimony was not offered to prove that Carroll and Lind were arrested for possession of marijuana but to show that Lind and Burstad knew each other. We find Carroll's argument to be wholly without substance. Furthermore, Carroll did not object to this agent's testimony at trial. We find no error.

Carroll alone raises the questioning of an expert witness by the trial judge as the sixth issue. Again, Carroll did not object to the questioning by the judge during trial. The State questioned the person who performed the chemical analysis of the cocaine found in Blevins's room. Once during the examination the trial judge interrupted and the following exchange took place:

"THE COURT: Mr. Rash, what did you say that your analyses revealed that the substances are?

"THE WITNESS: The powder in each of the plastic bags containing State's Exhibits 4 and 5 was identified as a combination of l-cocaine hydrochloride and mannitol.

"THE COURT: Is l-cocaine hydrochloride a derivative of a natural substance?

"THE WITNESS: Ordinarily the l-cocaine is extracted from the coca plant. It also can be synthesized.

"THE COURT: Do you have any opinion in this case whether this was natural or synthesized?

"THE WITNESS: I personally would feel that it would be a natural product due to the fact that the synthetic route is quite expensive to go through.

"THE COURT: State's Exhibits 4 and 5 are received into evidence."

After the State had finished its questioning and both Carroll's and Lind's attorneys had finished cross-examination, the trial judge asked the following questions:

"EXAMINATION BY THE COURT:

"Q. Initially you stated that your analyses revealed, at least a portion of the substance you tested to be l-cocaine hydrochloride; is that correct?

"A. That's correct.

"Q. Also in your testimony you've referred to this substance as cocaine without the remaining parts, the 'l' from the l-cocaine and without the hydrochloride. Why the distinction or is one shorthand for the other or what is the reason that you referred to them in different terms?

"A. Well, I apologize for shortening things in saying just cocaine here in court today. And I should have in all instances referred to the substance as l-cocaine or l-cocaine hydrochloride. The hydrochloride just simply is a salt form of cocaine. The 'l' in front of cocaine refers to the ability of that particular compound to rotate a beam of polarized light to the left versus the possible compound d-cocaine which would rotate a beam of polarized light to the right. And that is basically saying that a chemical compound could be kind of like a person's hand, two compounds being like both of your hands, yes, they are identical but no, they're really mere images of each other so they're isomers. And this is what the 'l' stands for. And the hydrochloride simply is the hydrochloride salt of cocaine.

"Q. So by using the phrase or the term cocaine in your testimony you shortened the full term which you previously mentioned.

"A. Yes, and I do apologize for that."

■ We addressed a similar issue in *State v. Yodsnukis*, 281 N.W.2d 255 (N.D. 1979). There, we set forth the factors which we will consider in determining whether or not a "judge's interrogation of witnesses [is] proper or, conversely, unduly prejudicial to the defendant and therefore an abuse of the judge's discretion, . . ." *Yodsnukis*, 281 N.W.2d at 260. We have two concerns which may be competing: the defendant's right to a fair trial and permitting and even encouraging the trial judge to clarify testimony and ferret out elusive facts so long as he does it impartially. *Yodsnukis*, 281 N.W.2d at 260. A trial judge acts properly when his questioning is designed solely to clarify the examined witness's testimony. *Yodsnukis*, 281 N.W.2d at 261.

■ The first three questions asked by the trial judge only clarified a prior answer and elicited an opinion which appears to us to be unrelated to the charge for which the defendants were tried. Similarly, the last three questions the trial judge asked only

served to clarify the technical answers given by the expert witness. The witness referred to cocaine in a number of different ways, most of which were either the full chemical name for cocaine or an abbreviated chemical name. The judge's questions served to determine whether or not the witness was referring to the same substance, even though using different names. Carroll was not prejudiced by the trial judge's questioning.

The seventh issue was raised only by Carroll. The trial judge refused to accept into evidence a plea-bargaining agreement between the State's Attorney and Burstad. The reason the trial judge refused to admit the evidence is that he had previously rejected the plea-bargaining agreement in the case of *State v. Burstad*. The basis of the trial judge's ruling was that the plea agreement was not relevant because it was rejected and because the State had already elicited testimony about what inducements had been promised by the State for Burstad's testimony. Charges were pending against Burstad for conspiracy and delivery of LSD in Grand Forks County and possession and delivery of cocaine and sale and delivery of quaaludes in Traill County. At the trial of Carroll and Lind, Burstad testified that the State's Attorney had told him that the State was going to drop the charge of delivery of LSD; that Burstad was going to plead guilty to the two charges in Traill County; and that the State's Attorney advised him that he would recommend that the sentence for the charges in Traill County run concurrently with the sentence for the conspiracy charge. Burstad also testified that the State's Attorney told him that he would recommend a sentence of six years with two years suspended in the conspiracy charge.

■ Under these circumstances we agree with the trial judge that any testimonial or documentary evidence relating to the rejected plea agreement would be either irrelevant or merely cumulative and could be confusing because the plea agreement was rejected by the trial court. Rules 401 and 403, N.D.R.Ev.

The eighth issue, raised by both Carroll and Lind, is that the trial judge erred when he denied motions for judgment of acquittal made at the close of the State's case and at the close of the evidence.

Carroll and Lind argue that the cases against them were based solely upon the uncorroborated testimony of the co-conspirators who pleaded guilty, Burstad and Blevins. They point to Section 29–21–14, N.D.C.C., as requiring corroboration of the testimony of Burstad and Blevins to sustain a conviction. They also argue that the evidence was insufficient to support the conviction.

We have held many times that we will reverse a decision of a jury only if the record presents no substantial evidence to support a verdict. In so doing, we must view the evidence in the light most favorable to the verdict. *State v. Flohr*, 310 N.W.2d 735, 737 (N.D.1981). We believe that the record here contains substantial evidence which supports the verdict. We have summarized the facts of the case at the beginning of this opinion. The facts as summarized were taken from the transcript of the trial.

Carroll and Lind also argue that because there was no corroboration of the testimony of the co-conspirators who testified against them and because Section 29–21–14, N.D.C.C.,[4] prohibits conviction upon the testimony of an accomplice unless corroborated by other evidence, the evidence is insufficient as a matter of law. The trial judge included an instruction to the jury on corroboration which essentially repeated Section 29–21–14, N.D.C.C.[5]

To analyze the effect of the statute and the jury instruction we need to consider Section 12.1–03–01(1), and especially subsection c, which provides:

"12.1–03–01. *Accomplices.* 1. A person may be convicted of an offense based upon the conduct of another person when:

"a. Acting with the kind of culpability required for the offense, he causes the other to engage in such conduct;

"b. With intent that an offense be committed, he commands, induces, procures, or aids the other to commit it, or, having a statutory duty to prevent its commission, he fails to make proper effort to do so; or

"c. He is a co-conspirator and his association with the offense meets the requirements of either of the other subdivisions of this subsection."

The meaning of this statute is readily apparent when reference is made to the proposed Federal Criminal Code, the source from which North Dakota adopted most of Title 12.1, N.D.C.C. Section 401(1) of the proposed Federal Criminal Code is virtually identical in all material respects to Section 12.1–03–01(1), N.D.C.C. The comment in the Study Draft states that subsection (1)(c) of the proposed Federal Criminal Code rejects the doctrine of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed.

4. Section 29–21–14 provides:

"*Testimony of accomplice—Corroboration required.*—A conviction cannot be had upon the testimony of an accomplice unless he is corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof."

5. The instruction given is as follows:

"CORROBORATION NEEDED

"A conspirator is a person who is voluntarily involved with another, directly or by agreement to commit a crime, both having a common purpose or intent.

"A Defendant cannot be convicted upon the testimony of a co-conspirator unless such testimony is corroborated by other evidence that fairly connects a Defendant with the commission of the offense. The corroboration is not sufficient if it merely shows that the offense was committed or how it was committed. You must be satisfied that there is some evidence either direct or circumstantial, aside from the testimony of the alleged co-conspirator, from which you may infer not only that the crime charged was committed but that a Defendant was implicated in it.

"The sufficiency of the corroborating evidence is for you to determine. If the testimony of a co-conspirator is corroborated, you have a right to consider all of his testimony the same as any other testimony in the case."

1489 (1946), that "mere membership in a conspiracy creates criminal liability for all specific offenses committed in furtherance of the conspiracy." Study Draft of a New Federal Criminal Code, p. 30. In the Working Papers to the proposed Federal Criminal Code the *Pinkerton* doctrine, rejected in Section 401(1), is explained. "The effect of the *Pinkerton* doctrine is that mere membership in a conspiracy is sufficient not only for criminal liability as a conspirator but also for all specific offenses committed in furtherance of it, although, if the dictum [of *Pinkerton*] is added, the offenses must be a reasonably foreseeable consequence (so that, for example, murder in furtherance of the conspiracy to evade taxes would not usually qualify).... Aiding [as an accomplice] should mean something more than the attenuated connection resulting solely from membership in a conspiracy and the objective standard of what is reasonably foreseeable." Working Papers of the National Commission on Reform of Federal Criminal Laws, Vol. I, at 155–156. The purpose of the language of Section 401(1) of the proposed Federal Criminal Code and Section 12.1–03–01(1) is to renounce any rule that a co-conspirator is automatically an accomplice to any other crime committed in furtherance of the conspiracy.

Section 12.1–03–01(1) does not automatically make a co-conspirator an accomplice to a crime committed in furtherance of the conspiracy. Further, we have no authority cited to us that a co-conspirator is synonymous with an accomplice. The North Dakota Criminal Code is consistent in its separate treatment of co-conspirators and accomplices, as evidenced by Section 12.1–06–04(5): "Accomplice liability for offenses committed in furtherance of the conspiracy is to be determined as provided in Section 12.1–03–01." The definition of "accomplice" in Section 12.1–03–01(1)(a) and (b), specifies acts different from those set forth in the definition of "criminal conspiracy" in Section 12.1–06–04(1).[6]

The effect of the instruction was to place a higher burden of proof upon the State because corroboration of a co-conspirator's testimony was required, under the instruction given, in order to convict. Because the instruction was given without objection by the State, we will analyze the argument of Carroll and Lind in light of the instruction.

■ In cases where Section 29–21–14 has been used we have said that any amount of corroboration will be sufficient to give the case to the jury to determine the sufficiency of the corroboration. *State v. Thorson*, 264 N.W.2d 441, 445 (N.D.1978). The corroborating evidence must connect the defendant with the offense. "It need not be sufficient, in itself, to warrant a conviction or establish a prima facie case. All that is required is that the evidence corroborates the accomplice as to some material fact or facts, and tends to connect the defendant with the commission of the offense.... Corroboration may be furnished by facts and circumstances which tend to connect the defendant with the commission of the crime." *Thorson*, 264 N.W.2d at 445, quoting *State v. Anderson*, 172 N.W.2d 597, 600 (N.D.1969).

■ The trial court ruled on the motion for acquittal at the end of the State's case and again at the end of the presentation of the evidence. The trial court found that there was corroboration, as required by Section 29–21–14. We agree. Two co-conspirators, Burstad and Blevins, testified. We need not decide today whether or not the testimony of one can be used to corroborate the testimony of the other. In this case there was additional evidence which would independently suffice to corroborate the testimony of either or both of the co-conspirators. There was testimony from drug-

6. Although there does not appear to be any basis for the instruction given which requires corroboration of the testimony of a co-conspirator before one charged with conspiracy may be convicted, we do not decide whether or not that instruction correctly states the law on the treatment of testimony of a co-conspirator.

The State did not object to the instruction and has waived any objection it might have. Therefore, we assume corroboration of the testimony of a co-conspirator is required as the law of the case only because the instruction to the jury required it.

enforcement agents as to statements made to them by Burstad and Blevins: statements made prior to trial, before they realized who the drug-enforcement agents were, and before Burstad and Blevins would have a reason to incriminate Carroll and Lind. The evidence of the receipt found in Lind's wallet corroborated the testimony given which explained how Lind transferred money to Carroll to finance the cocaine transaction. It also corroborated Blevin's testimony that the transfer of money would be made to appear as payment for motorcycle parts. The fact that Lind transported Blevins from Hillsboro to Burstad's apartment and that he arrived at the airport to pick up Carroll, in isolation is not incriminating, but when seen in perspective of the other evidence, it corroborates the testimony of Burstad and Blevins. The same is true with the records of the telephone calls made by Lind and Burstad. We believe there was corroboration of the testimony and that the case was properly submitted to the jury.

The ninth issue is raised by Lind alone. He argues that the trial court erred when it failed to give a portion of a proposed instruction. The rejected portion provided: "The jury, however, should view the statement of an alleged co-conspirator with caution and great care and give it only such weight and credibility as the jury may think it deserves." The instruction in issue 8, *supra*, required corroboration of the testimony of a co-conspirator. As discussed, *supra*, the trial court was required to and did determine that there was some corroborative evidence and therefore permitted the jury to determine the sufficiency of the corroborative evidence. Lind argues that in addition the jury should have been cautioned about the statements of co-conspirators. We do not agree with Lind's argument. The position taken by Lind duplicates the protection given the defendants by the requirement of corroboration of a co-conspirator's testimony and the essence of the instruction on "Weight and Credibility." Lind's rejected instruction deals with the credibility of the co-conspirator. Instructing jurors to view a co-conspirator's testimony with caution merely tells them to judge the credibility of the witness. The trial judge gave the jurors an instruction which states that they were to determine the credibility of those who have testified. The jury was also instructed that in judging the credibility, "you may consider those facts and circumstances in the case which tend to strengthen, weaken or contradict one's testimony." Lind argues here that the fact that a co-conspirator was a witness for the prosecution necessitates a special instruction. Because the jury instructions given by the trial judge required corroboration and directed the jury to consider the facts and circumstances in the case which affected the testimony of a witness, the jury in effect was warned that the testimony of an accomplice should be viewed with caution. Thus the essence of Lind's requested instruction is contained in the instruction quoted above. A specific instruction on the testimony of an accomplice, similar to that requested by Lind, would not be improper [*State v. Carothers*, 84 Wash.2d 256, 525 P.2d 731 (1975)], but in view of the instructions given it was not prejudicial error to refuse to give Lind's requested instruction. *State v. Smith*, 88 N.M.App. 541, 543 P.2d 834 (1974); *contra, State v. Beene*, 257 N.W.2d 589 (S.D.1977).

In the tenth issue Carroll alone argues that the trial court did not have jurisdiction to prosecute him for the crime of conspiracy. Carroll argues that when the commission of a public offense, commenced outside the State, is consummated within the State, the defendant is liable to prosecution as provided in Section 29–03–01.1, N.D.C.C. Carroll's argument continues that because Section 29–03–01.1 does not list the crime of conspiracy he cannot be prosecuted. Carroll's analysis begins with a faulty premise. The evidence in the case showed that the conspiracy to deliver cocaine began in North Dakota. Carroll cannot argue that the trial court had no jurisdiction over him for a crime which began within North Dakota.

The eleventh issue, raised by both Carroll and Lind, is the trial court's treatment of a question from the jurors after they began their deliberations. The question involved the wording of the informations charging Lind and Carroll. Except for the names of Lind and Carroll, the informations are identical:

"... Raymond Carroll a/k/a Buster Carroll [Gregory Lind] ... did commit the crime of CONSPIRACY TO DELIVER A CONTROLLED SUBSTANCE committed as follows, to wit:

"That at the said time and place the said Raymond Carroll ... [Gregory Lind] did agree and conspire with Harry E. Blevins, Greg Lind, and Michael Burstad [Harry E. Blevins, Raymond Carroll a/k/a Buster Carroll, and Michael Burstad] to possess, obtain and deliver a controlled substance, namely cocaine, and in fact did possess cocaine with the intent to deliver to agents of the Attorney General's Drug Enforcement Unit. ... All in violation of sections 12.1–06–04(1), 19–03.1–07(2)(d), 19–03.1–23(1)(a), 12.1–06–01(3) and 12.1–32–01(3) of the North Dakota Century Code. Penalty Class B Felony."

Because of the language "and in fact did possess cocaine" the jury questioned whether or not Lind and Carroll were charged with actual possession of cocaine as well as conspiracy. The jury also pointed out that if both were charged with actual possession also, then the verdict forms conflict with that interpretation. The verdict forms for each Lind and Carroll state:

"We, the jury, duly impanelled and sworn to try the above entitled case, unanimously find the Defendant Raymond Carroll, also known as Buster Carroll [Gregory Lind] (circle one) NOT GUILTY GUILTY of the offense of Conspiracy to Deliver a Controlled Substance as charged in the Amended Information."

The trial court paraphrased the jury's question as being whether or not each defendant must be found to have had actual possession of cocaine.

As the question of the jury points out, the informations are imprecisely drawn. There are at least two interpretations of the meaning of the words "and in fact did possess cocaine with intent to deliver." The first is that the State is alleging that each of the defendants, Carroll and Lind, conspired to deliver a controlled substance and that each possessed cocaine with the intent to deliver. The second interpretation is that the State is alleging that each defendant did conspire and that the overt act of the conspiracy was possession of cocaine with intent to deliver.

According to Rule 6(c), N.D.R. Crim.P., "The indictment or information shall name or otherwise identify the defendant, and shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged." The information must be specific enough to advise the defendant of the charge against him and to enable him to prepare for trial and to plead the result in bar of a subsequent prosecution for the same offense. *State v. Motsko*, 261 N.W.2d 860 (N.D.1977).

The definition of "conspiracy" in North Dakota is contained in Section 12.1–06–04: "1. A person commits conspiracy if he agrees with one or more persons to engage in or cause conduct which, in fact, constitutes an offense or offenses, and any one or more of such persons does an overt act to effect an objective of the conspiracy. ..." This statute requires two elements to the crime of conspiracy. The first is an agreement as explained in the statute. The second is the commission of an overt act. Although this court has not commented upon the new conspiracy statute, we believe that the law of statutory conspiracy is fairly well settled. An information charging conspiracy must contain an allegation of at least one overt act, as required by statute. Because an overt act must be alleged it must also be proved by the State beyond a reasonable doubt. An overt act may be an act of only a single one of the conspirators and need not be itself a crime. *Braverman v. United States*, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942). It is not necessary to find

that the defendant committed the overt act charged, only that one of the conspirators knowingly committed it. *United States v. Kelly*, 569 F.2d 928 (5th Cir. 1978). Once an illicit agreement is shown, the overt act of any conspirator may be attributed to the other conspirators to establish the offense of conspiracy. *People v. Berkowitz*, 50 N.Y.2d 333, 428 N.Y.S.2d 927, 406 N.E.2d 783 (1980). The burden upon the prosecution to prove an overt act is minimal, for almost any act in furtherance of the unlawful agreement will satisfy the overt-act requirement. *People v. Persinger*, 49 Ill. App.3d 116, 6 Ill.Dec. 950, 363 N.E.2d 897 (1977). See Section 12–03–01, N.D.C.C., predecessor to Section 12.1–06–04.

The substance of the trial court's original instructions to the jury basically followed the law of conspiracy as stated above. The instruction on essential elements listed as a requirement that "one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the Amended Information on or between the time and at the place alleged; and ...

"If the jury should find beyond a reasonable doubt from the evidence in the case that existence of the conspiracy charged in the Amended Information has been proved, and that during the existence of the conspiracy one of the overt acts alleged was knowingly done by *one of the conspirators* in furtherance of some object or purpose of the conspiracy, then proof of the conspiracy offense charged is complete; and it is complete as to each person found by the jury to have been willfully a member of the conspiracy at the time the overt act was committed, *regardless of which of the conspirators did the overt act.*" [Emphasis added.] The instruction which defined "overt act" stated that it is "any act knowingly *committed by one of the conspirators,* in an effort to effect or accomplish some object or purpose of the conspiracy." [Emphasis added.] The instruction entitled "Consideration of the Evidence" included the statement that if conspiracy has been proved beyond a reasonable doubt, "and a Defendant willfully became a member of the con-

spiracy and thereafter *one or all of the conspirators knowingly committed one or more of the overt acts charged* in furtherance of some object or purpose of the conspiracy, then there may be a conviction." [Emphasis added.] Other instructions also indicate that only one of the conspirators need commit an overt act. None of the instructions required that each defendant must have committed the overt act charged.

Only when the jury asked whether or not the defendants were also charged with possession of cocaine did the defendants argue that the State must prove that the overt act, possession of cocaine, was committed by each defendant. Until the trial judge gave the jury a supplemental instruction, the law of the case, contained in the jury instructions, consistently required that only one of the conspirators must have committed an overt act to further the conspiracy. The information for each defendant alleged that each agreed and conspired with the other and with Harry Blevins and Michael Burstad. Blevins and Burstad testified that they pleaded guilty to the conspiracy charges against them and Blevins testified that he had possessed cocaine.

At first the trial judge suggested answering the jurors' question by referring them to the instructions which defined the crime of conspiracy and the instruction which listed the essential elements of the crime. The defense counsel responded by arguing that the jury should be instructed that the State must prove that each defendant actually possessed cocaine. Their reasoning was that each information charged actual possession as the overt act, and due to the manner in which the information is worded should be read to allege actual possession by each defendant.

During the discussion of the proposed jury instructions neither defense counsel objected to the language requiring only that one conspirator be found to have committed an overt act. In fact, the instructions given requiring only that a conspirator had committed an overt act were instructions proposed by defense counsel. Al-

though both defense counsel took exception to the trial court's rejection of other proposed jury instructions, none of the rejected instructions dealt with the commission of the overt act. Both counsel also objected to the use of other jury instructions proposed by the trial judge. Again, none of the instructions objected to dealt with the commission of the overt act.

■ If the defense counsel believed throughout the course of the trial that each defendant must be found to have actually possessed cocaine, they should have objected to the instructions initially given to the jury which stated that only one member of the conspiracy need have committed an overt act. Because they did not object, they have waived that objection.

It should have been obvious to the defense counsel at the time the original jury instructions were given that the law of the case was to the effect that only one conspirator actually need have possessed. The State did not object to the instructions as originally given because the instructions followed what it believed the information alleged, i.e., that one of the members of the conspiracy did in fact possess cocaine.

The trial judge did, however, give a supplemental instruction to the jury. The supplemental instruction was that "the State must have additionally proven beyond a reasonable doubt that a defendant did the overt act of possession of cocaine with intent to deliver ..." The trial judge went farther, however, and gave an instruction on actual and constructive possession.[7] After defining both, the trial judge said, "You may find that the element of possession as that term is used in these instructions is present if you find beyond a reasonable doubt that a defendant had actual or constructive possession, either alone or jointly with others." Both defendants now raise as

error the instruction which defined "constructive possession."

■ If the supplemental instruction, that each defendant must have had possession of cocaine to meet the overt-act requirement to be found guilty of conspiracy, was error, we believe that it is harmless error. By so instructing, the trial judge imposed a greater burden upon the State.

Under the original instructions the State's burden of proving the overt act was fairly easy. Only one member of the conspiracy was required to have committed the overt act. Blevins testified that he possessed the cocaine which was to be sold to the drug-enforcement agent and that he pleaded guilty to the same conspiracy charge facing both defendants. If the jury believed Blevins's testimony the overt-act requirement would have been easily met. After the supplemental instruction neither defendant could be found guilty based upon possession of cocaine by one of the other two members of the conspiracy. In order for the jury to find each defendant guilty it was required to find that each defendant had either actual or constructive possession of the cocaine. By returning a verdict of guilty the jury must have found each defendant to have had actual or constructive possession of cocaine.[8]

Evidence was introduced at trial which the jury could have used to support a finding of constructive possession. Burstad testified that he and Lind provided the funds to bring the cocaine to Grand Forks and that Lind had wired the money to a person in Florida. Lind's wallet contained a receipt for a money order sent to Carroll's motorcycle repair shop in Florida. Blevins testified that Carroll had arranged with him to transport the cocaine to Grand Forks. Burstad testified that Blevins

---

7. The effect of the instruction may have been to reverse the previous instructions on the elements of the crime, the definition of the overt act, and the other instructions which stated that only one member of the conspiracy need have committed an overt act, although the trial judge did not admonish the jurors to ignore the previous instructions.

8. See Whitebread & Stevens, *Constructive Possession in Narcotics Cases: To Have and Have Not*, 58 Va.L.Rev. 751 (1972). The article suggests that possession should be determined upon either a defendant's exclusive control over the area in which the drug is found or substantial evidence of the defendant's past possession of the drug on his person.

would not reveal the location of the cocaine until Carroll arrived. This testimony could have been viewed by the jury as supporting constructive possession by each defendant.

We do not believe that the supplemental instruction was necessary. We do not comment upon whether or not the trial judge was correct in instructing on actual and constructive possession after giving the supplemental instruction. Error, if any, prejudiced the State and benefited the defendants. Because the overall effect was to place a greater burden upon the State's proof than was necessary we decide that any error was harmless. *State v. Goetz*, 312 N.W.2d 1, 13 (N.D.1981).

■ Both defendants raise another issue related to jury instructions. Prior to the question from the jury discussed above, the jury asked: "If the defense had presented evidence pertaining to the defendant's business, would this have required the defendants to take the stand if requested by the prosecution?" The trial judge answered, ". . . no, the defendants are never required to take the stand in a criminal proceeding." Carroll argues that the trial judge's response should have been that the jury should not speculate on the evidence, but to rely only upon the evidence that was received and that the existing instructions adequately explained the right of the defendants to not testify. As both Carroll and Lind argue, the existing instructions already stated that a defendant was not required to take the stand and testify. In addition, this had already been pointed out to the prospective jurors during voir dire. The instruction given to the jury originally was: "In the trial of a criminal action before any Court of this State, a Defendant, at his own request and not otherwise, is a competent witness. If a Defendant chooses not to testify during the trial, his mere silence does not create or raise any inference of guilt against him. The attorney prosecuting the case cannot mention it and you must not discuss or consider it." The judge's answer to the jury's question restates the above-quoted jury instruction. No prejudice can occur as a result of the trial judge's concise rephrasing of the instruction.

■ The twelfth issue is raised by both Carroll and Lind. They argue that the trial court erred when it ruled that the Uniform Controlled Substances Act, Chapter 19–03.1, N.D.C.C., was not unconstitutional. Their arguments are identical. They contend that evidence at trial indicated that cocaine is not a narcotic drug. Cocaine is, however, classified as a narcotic drug in Chapter 19–03.1. Carroll and Lind argue that the penalties and prohibitions of Chapter 19–03.1 that are based upon the erroneous classification are unconstitutional as a deprivation of due process and equal protection. Section 19–03.1–01(15) defines "narcotic drug" as including coca leaves or any derivative of coca leaves. Section 19–03.1–07 lists coca leaves or any derivative of coca leaves within the controlled substances under Schedule II.

Carroll and Lind's argument was also made in the case of *State v. Kainz*, 321 N.W.2d 478 (N.D.1982). We said there: "Although there may be some scientific basis for Kainz' argument that cocaine is not pharmacologically a narcotic drug, we agree with the overwhelming state and federal decisions that the Legislature has the authority to classify cocaine as a narcotic drug for control and penalty purposes." *Kainz*, 321 N.W.2d at 482.

■ The thirteenth issue is raised by Lind alone. He argues that the conspiracy statute, Section 12.1–06–04, is unconstitutional because it is overbroad, vague, and does not provide sufficient definiteness to apprise an individual of the alleged criminality of his actions. Lind contends that the statute violates due process.

The relevant portion of the conspiracy statute provides: "A person commits conspiracy if he agrees with one or more persons to engage in or cause conduct which, in fact, constitutes an offense or offenses, and any one or more of such persons does an overt act to effect an objective of the conspiracy." Sec. 12.1–06–04(1). Lind argues that because the trial judge gave the sup-

plemental instruction on constructive possession [see discussion under issue 11], and the statute requires an agreement to engage in conduct which *in fact* constitutes an offense, in this case the statute is vague. We do not find merit in Lind's argument.

As discussed under issue 11, the statute requires an agreement and an overt act. The supplemental instruction was given in response to a jury question about the overt-act requirement. The conduct which is the subject of the conspiracy here is possession with intent to deliver a controlled substance. That conduct does, in fact, constitute an offense. Therefore, as the statute is applied in the instant case we do not agree that it is vague.

As the fourteenth issue Lind argues that the sentence he received imposed a penalty upon him for pleading not guilty and requiring the State to try him because his sentence was inconsistent with the sentences given to Blevins and Burstad. In *State v. Hass*, 268 N.W.2d 456, 464 (N.D. 1978), we said: "It is the rule in this jurisdiction that sentences within the range of the minimum and the maximum are within the discretion of the trial court, and 'will not be set aside for abuse of discretion unless: (1) the sentence exceeds the statutory limits [citation]; or (2) the trial judge substantially relied upon an impermissible factor in determining the severity of the sentence to be imposed [citation].' *State v. Rudolph*, 260 N.W.2d 13, 16 (N.D.1977); *State v. Smith*, 238 N.W.2d 662, 673 (N.D. 1976)."

Lind appears to be arguing that the trial judge substantially relied upon impermissible factors when he sentenced Lind. There is nothing in the record which would support a contention that the trial judge considered the fact that Lind pleaded not guilty. The transcript indicates that the trial judge considered the factors in Section 12.1–32–04, N.D.C.C. We do not agree that Lind's sentence reflected a penalty for Lind's plea of not guilty which required the State to prove his guilt.

So long as sentences are within the minimum and the maximum provided by law they will not be set aside except for abuse of discretion by the trial court. Lind received eight years, with three years suspended. Blevins received two years. The record does not contain the sentence Burstad received. Lind's sentence is within the maximum permitted by statute for the crime for which he was convicted. The transcript indicates that the trial judge utilized his discretion when he sentenced Lind. The trial judge considered the statutory factors. We do not agree that the trial judge abused his discretion when he sentenced Lind.

We affirm the convictions of Gregory Lind and Raymond Carroll.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.